*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, | ) ) ) ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| ZANDER B. and KELLY B., | ) |
| | ) |
| Appellees. | ) |
| | ) |

Supreme Court No. S-17399

Superior Court No. 3PA-17-00077 CN

O P I N I O N

No. 7489 – October 30, 2020

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Kevin G. Clarkson, Attorney General, Juneau, for Appellant. J.E. Wiederholt, Aglietti, Offret & Woofter, LLC, Anchorage, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

MAASSEN, Justice.
WINFREE, Justice, with whom CARNEY, Justice, joins, dissenting.

## I.   INTRODUCTION

The Office of Children's Services (OCS) took emergency custody of a three-year-old child and placed him with non-relative foster parents. The child had lived

with the foster parents for over a year when OCS informed them of its intent to place the child with his grandmother. The superior court allowed the foster parents to intervene in the child in need of aid (CINA) proceedings to contest OCS's placement decision. After a placement review hearing, the court stayed the placement decision, concluding that OCS abused its discretion in deciding to place the child with his grandmother.

OCS appeals, arguing that the superior court erred both by permitting the foster parents' intervention and by finding that OCS abused its discretion in its placement decision. We hold that the court did not abuse its discretion by permitting intervention under the circumstances of this case. We also hold that the court's factual findings were not clearly erroneous and that the court did not err when, based on those findings, it decided that OCS abused its discretion in its placement decision. We therefore affirm the superior court's order staying the placement decision.

## II. FACTS AND PROCEEDINGS

### A. Background

In August 2017 OCS took emergency custody of three-year-old Douglas,[1] acting on allegations that his mother was using drugs and living with Douglas in a truck. OCS placed Douglas temporarily in foster care with non-relative foster parents, Zander and Kelly B.

Shortly thereafter, Douglas's paternal grandmother, Cassidy, asked that OCS place him with her in Texas. Douglas's father was denied placement in January 2018, and — because of the statutory placement preference for adult family members[2] — OCS began considering Cassidy as an option. By June the permanency

---

[1]     Pseudonyms have been used throughout this opinion to protect the parties' identities.

[2]     *See* AS 47.14.100(e)(3)(A); AS 47.10.080(s).

plan for Douglas's future was adoption. OCS received a positive home study for Cassidy from Texas pursuant to the Interstate Compact on the Placement of Children (ICPC), and it decided to transition Douglas into Cassidy's care.

OCS planned a slow transition, with several visits between Douglas and his grandmother before the child was relocated permanently. Cassidy visited Douglas in Alaska three times between March and November 2018. On November 19 OCS informed Douglas's foster parents of its intent to place Douglas with Cassidy. The change in placement was set for December 11; OCS intended that Cassidy would make one final visit to Alaska and take Douglas back to Texas with her at that time.

In early December the foster parents filed a motion to intervene in the CINA proceedings to contest OCS's placement decision. In their motion the foster parents asserted that they "wish[ed] to adopt [Douglas] as their own," though they had not yet filed an adoption petition. The superior court stayed the relocation in part, permitting Douglas to go to Texas with his grandmother for a "temporary visit" pending the placement review hearing. At the same time the court granted the foster parents' motion to intervene pursuant to Alaska Civil Rule 24(b), noting that their motion for intervention focused on "the same questions of law and fact as the underlying CINA proceeding, what is in the child's best interest."

## B. The Placement Review Hearing

The superior court presided over a three-day placement review hearing beginning in late December 2018 and continuing into January 2019. The foster parents, OCS, and Douglas's biological father called witnesses. Douglas's guardian ad litem (GAL) also participated, supporting OCS's proposed placement with Cassidy.

### 1. Testimony of the foster parents' witnesses

Douglas's preschool teacher, an early childhood special education teacher, testified that she had worked with Douglas in the spring of 2018 and became his teacher

in the fall. She testified that Douglas was "an extremely high-needs child." When he first started school in the spring he had daily outbursts and could be "extremely aggressive and explosive in his behavior." He directed his tantrums at "adults [who] were trying to . . . alter his routine or make him do something he didn't want to do." Of all the children the teacher had encountered in her 16 years of experience, she placed Douglas "in the one percentile of children with the most extreme difficulties and challenging behaviors." She testified that Douglas was a "force" and could be very physical when trying to have his way: "[Y]ou have to really hold your ground and be consistent and make sure he lives up to your expectations because it's a slippery slope if you start giving him control . . . ." She testified that she never had a student with such extreme trauma, anxiety, and aggression; because of his many challenges, Douglas "was supported by an adult one-on-one" throughout each day.

The teacher testified that Douglas's behavior "dramatically changed" for the worse immediately after visits with Cassidy; he regressed and went into "full panic mode" whenever his foster parents left. She testified that she observed Cassidy with Douglas and did not think Cassidy was able to care for him. She believed that Cassidy did not seem to appreciate the extent of Douglas's emotional challenges and lacked useful strategies to calm him down. She also worried about Cassidy's physical ability to care for Douglas, especially as he got older.

The teacher testified that she was "shocked" when she learned that OCS intended to place Douglas with Cassidy, and she emailed a letter to his OCS caseworker and GAL describing Douglas's dramatic regression after Cassidy's visits. She testified that she received no reply from the OCS caseworker. After Cassidy's second visit, the teacher notified the OCS caseworker that she thought the decision to place Douglas with Cassidy was "[d]evastating." She testified that she reached out to OCS three times to express concern; after the second and third emails, she received responses thanking her

and stating that the emails would be put in Douglas's file, but she had no other contact with OCS.

The teacher also testified that the team of professionals who worked with Douglas at school thought placing the child with his grandmother "would be the worst thing they could do for [him]." She predicted that if Douglas returned to her class after spending time with Cassidy without therapy, they would "be starting back at ground zero with extreme behavior 95% of the time."

The superior court also heard the testimony of Douglas's pediatrician. She testified that when she first met Douglas in August 2017 he probably had reactive attachment disorder — an inability to properly form attachments or relationships with others that may appear in children who change homes and caregivers. She testified that Douglas's environmental experiences and past trauma likely contributed to his developmental delays. The pediatrician also testified, however, that Douglas made "remarkable" improvement despite his challenges. When she saw him in June 2018, about ten months after their first encounter, Douglas's development was closer to age-appropriate; he "had obviously gained a couple years of developmental ability in that time." She attributed this improvement to the hard work of all his caregivers and his foster parents. The pediatrician also testified that it would be in Douglas's best interests "to have a good, stable environment . . . like he had, or that he could continue to have with [his foster parents]." She testified that no one from OCS had contacted her about Douglas's placement.

The physical therapist at Douglas's elementary school testified that she had started seeing him in March 2018 and worked with him twice a week that spring and again in the fall. When she first met him, his gross motor skills were delayed and he had some "very significant" behavioral issues; when he was upset he would bite, kick, throw things, run away, scream, and scratch himself and others. She testified that she

"developed a behavioral modification program" with the involvement of the foster parents and other caregivers, and that Douglas's improvement over the summer was among the most significant she had seen; when he returned to school in the fall, he was more cooperative and "significantly easier to redirect." She attributed his improvement to "being in a safe, structured, healthy environment." She testified that Douglas met his physical therapy goals and was discharged from her program in November 2018.

The physical therapist also testified that structure and consistency were very important for Douglas and that he benefitted from constant, hands-on attention. She testified that Douglas could continue to progress if he received the care and services he needed while living with his grandmother. She testified that OCS never contacted her about Douglas's placement.

Two occupational therapists who had worked with Douglas also testified. In their opinion, he was negatively affected by visits with Cassidy, with increased anxiety and behavioral issues. One therapist testified that her last session with Douglas on November 28, 2018, was "difficult"; he appeared "very anxious" and "emotionally dysregulated," which she attributed "probably [to] all the stress and the pending move." The other therapist testified that Cassidy attended one therapy session with Douglas in September 2018, where the therapist observed some concerning behavior. She testified that Cassidy did not seem attentive to the therapist's advice; for example, after Cassidy was told how important it was to encourage Douglas to do things for himself like climbing onto swings, she picked him up and set him on a swing. The therapist testified that Douglas was supposed to spend the day with Cassidy following the therapy session, but he was afraid, tried to run back to his foster parents, and tried to hit his grandmother once they were in the car. The therapist testified that she never talked to anyone from OCS, but she did send her notes to the agency and someone responded that the notes would be forwarded to Douglas's caseworker. The notes contained the therapist's

opinion that Douglas had formed a strong bond with his foster parents and that moving him would hinder his progress and perpetuate his trauma and stress.

The foster father testified that when he tried to explain Douglas's behavior to Cassidy and how best to respond, "[s]he didn't seem to acknowledge or understand." He testified that Cassidy ignored advice he and his wife gave her about how to communicate with Douglas on Skype calls. The foster mother testified that she did not think Cassidy understood Douglas's situation "and what it would take to get him to work through the things he's struggling with." She testified that Cassidy "relied on [the foster parents] to step in and solve issues, and she was physically incapable of restraining [Douglas] when he was throwing a fit."

Like Douglas's care providers, his foster father testified that Douglas regressed dramatically after Cassidy's visits with him in Alaska. The foster father testified that Douglas regressed about 10-12 months after Cassidy's first overnight visit and regressed even further after the second. The foster father testified that he explained his and his wife's concerns about Cassidy to OCS.

### 2. Testimony of OCS and Texas caseworkers

Douglas's caseworker, a protective services specialist with OCS, testified that she believed placing Douglas with Cassidy was in Douglas's best interests because the placement would "strengthen family ties." Living in Texas, Douglas would be able to have a relationship with his father and other family members, and "there's a sense of belonging when you're in your biological family." She testified that nothing led her to believe that Cassidy "wouldn't be a wonderful placement for [Douglas]."

The caseworker testified that while she was considering Cassidy's request for placement, she spoke with Cassidy on the phone about her life and her support systems. She testified that most of the other information OCS considered came from the Texas ICPC study, which OCS relied on "really heavily" in the absence of other

available ways of evaluating Cassidy's appropriateness as a placement for Douglas. Texas social workers had interviewed Cassidy, visited her home, collected records of her income and expenses, conducted background checks, and interviewed her family and friends. The caseworker did not know, however, whether Texas authorities had made any "evaluation of [Cassidy's] skill set with a child with these recognized problems." Besides the ICPC study, the caseworker relied on "just [her] conversations with [Cassidy] and then with [Douglas's] father and his experience with her."

The caseworker testified that the decision to place Douglas with Cassidy in Texas was made by her and her supervisor. She testified that they took the opinions of Douglas's care providers into consideration and that this information was "just as important as any other part." The caseworker testified that she communicated with an employee who worked with Douglas's occupational therapists but was never in contact with the therapists directly. She testified that she received the occupational therapist's report describing the difficult transition into Cassidy's care following a therapy session. She testified that she emailed Douglas's preschool teacher at the end of October asking for an update on Douglas's behavior, that she received the update, and that she responded to confirm she had received it. She testified that she always reviewed with her supervisor all the information she received from care providers.

The caseworker testified that changing Douglas's placement was "a really hard decision" because the foster parents had done "a really great job with" him. She testified that Douglas was "very attached to them" and that OCS took this into consideration by "mak[ing] the transition plan longer." She acknowledged that the move would be traumatic for Douglas. She testified that she understood the foster parents' concerns about placing Douglas with Cassidy, but that her placement decision was reinforced by the GAL's report of a visit with Cassidy (not further described in the

testimony), her own observations of Douglas "by himself with grandma,"[3] and the report of another OCS employee who saw that Cassidy "was able to de-escalate [Douglas] when he was pretty out of control and was able to physically handle him."

This other OCS social worker also testified at the placement review hearing. She had spent about an hour with Douglas and Cassidy after transporting Douglas between his foster parents and Cassidy for their final visit in December. The employee testified that Douglas had a 30-minute tantrum upon arrival at Cassidy's hotel, but that Cassidy did a "great" job of calming him. The social worker had no concerns about Cassidy's ability to care for Douglas.

The Texas social worker who completed Cassidy's ICPC study also testified at the hearing and explained that the study did not indicate any concerns. She acknowledged that the extent of Douglas's emotional, developmental, and physical challenges were relevant to the ICPC process, but she was unaware of Douglas's specific challenges other than that he "had some behavioral issues."

### 3. Cassidy's testimony

Cassidy testified that her visits with Douglas went well. She acknowledged Douglas's tantrums during transfers, but she testified that he became happy "[a]lmost immediately" once they were alone. She testified that her extended visit with Douglas in Texas was going well; at the time of the hearing he had been with her for about a month. According to Cassidy, Douglas was well behaved while in her care; he had no major tantrums and only acted out during Skype visits with his foster parents. She testified that Douglas did not have other meltdowns, "just . . . little disagreements" two or three times a week. She testified that Douglas generally responded well to her

---

[3] On December 5 the caseworker observed Douglas and Cassidy at the hotel before they traveled back to Texas. She testified that Douglas seemed happy and Cassidy handled him well.

parenting.  She testified that one of his only "meltdowns" was when the Texas social worker assigned to the case visited three or four days after Douglas first arrived in Texas.[4]

Cassidy testified that she had not observed Douglas's socialization developmental delays and was unaware of his physical challenges.  When asked if Douglas has "profound emotional attachment issues," she said, "I don't know.  He took to me pretty good."  She was beginning to research his challenges online but had not communicated with his foster parents or other care providers about his needs.

Cassidy testified that she recognized the importance of getting professional support for Douglas in Texas.  She testified that she had identified a primary care physician, a school that offered occupational therapy, and a possible location for play therapy.  However, Douglas had yet to have any professional care while in Texas.[5]

### C.    The Superior Court's Determination That OCS Abused Its Discretion

The superior court made an oral ruling on January 8, 2019, at the close of the hearing, finding that OCS abused its discretion when it decided to place Douglas with Cassidy.  The court issued an extensive written order on January 29, granting the stay of placement proceedings.[6]  The court introduced its written findings of fact by stressing

---

[4]    The child protective services worker in Texas testified that Douglas started to have a tantrum, but Cassidy was able to calm him down in approximately three minutes.  She conveyed this information to Douglas's caseworker.

[5]    The OCS caseworker testified that Douglas was unable to enroll in Texas Medicaid to pay for the services because he was technically only visiting the state, but that services would recommence once the Texas Medicaid issues were resolved.  In response to the court's question whether OCS could have bypassed Medicaid and paid for professional counseling itself, the caseworker said she did not know.

[6]    In the meantime, on January 17, the foster parents had filed their petition
(continued...)

how unusual it was to have foster parents with "any colorable claim to contest OCS'[s] family-first placement authority"; the court noted the breadth of OCS's discretion and the high evidentiary burden the foster parents had to meet in order to successfully challenge the agency's decision.

The court concluded, however, that the foster parents had met their high burden. The court found that Douglas had "significant mental, social, and physical needs, which require full-time, constant parental and professional supervision and care." But it found that Cassidy had "neither the understanding of [Douglas]'s conditions nor the capacity to beneficially address them"; that "OCS should have known, or at least suspected, that [Cassidy] was unsuited for placement"; and that it "could have evaluated [Cassidy]'s suitability with the evidence it was given by [Douglas]'s care providers or the [foster parents], but decided not to do so." The court concluded that OCS abused its discretion (1) when it decided "to relocate [Douglas] to Texas with a person that OCS knew, or with the exercise of reasonable caution should have known, was without apparent capacity to appreciate, understand, or address [Douglas]'s special needs"; (2) "by not creating a trauma-informed transition plan tailored to [Douglas]'s unique needs"; and (3) "by removing [Douglas] from the [foster parents'] custody and thereby ending the therapeutic and educational programs necessary to his emotional stability and development."

OCS appeals both the superior court's decision to allow the foster parents to intervene in the CINA case and its determination that the placement decision was an abuse of discretion.

---

**6**    (...continued)
to adopt Douglas.

## III. STANDARDS OF REVIEW

"Whether the trial court's findings comport with the requirements of the CINA statutes and rules is a question of law which we review de novo."[7] "Statutory interpretation raises questions of law to which we apply our independent judgment. We must adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[8] A superior court's "grant or denial of a motion for permissive intervention is . . . review[ed] for abuse of discretion."[9] "A decision constitutes abuse of discretion if it is 'arbitrary, capricious, manifestly unreasonable, or . . . stems from an improper motive.' "[10]

"The legislature has committed placement decisions to [OCS]'s discretion."[11] "[T]he superior court has authority to review [OCS]'s decision to determine if it is in the best interests of the minor. In reviewing the decision, the superior court applies the abuse of discretion standard."[12] This is an objective test: the court asks "whether the reasons for the exercise of discretion are clearly untenable or

---

[7] *S.S.M. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 3 P.3d 342, 344 (Alaska 2000).

[8] *Id.* (footnote omitted).

[9] *State, Dep'ts of Transp. & Labor v. Enserch Alaska Constr., Inc.*, 787 P.2d 624, 629 (Alaska 1989).

[10] *del Rosario v. Clare*, 378 P.3d 380, 383 (Alaska 2016) (alteration in original) (quoting *Gunn v. Gunn*, 367 P.3d 1146, 1150 (Alaska 2016) (quoting *Roderer v. Dash*, 233 P.3d 1101, 1107 (Alaska 2010))).

[11] *In re B.L.J.*, 717 P.2d 376, 380 (Alaska 1986).

[12] *Id.* at 380-81.

unreasonable."[13]  Whether the superior court erred in finding that OCS abused its discretion is a mixed question of law and fact.[14]  "For mixed questions of law and fact, 'we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[15]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Err Or Abuse Its Discretion When It Allowed The Foster Parents To Intervene In The CINA Proceedings To Contest OCS's Placement Decision.

#### 1.  Foster parent intervention does not violate the CINA statutes.

Alaska Statute 47.10.080(s) allows OCS to transfer a child from one placement to another "in the child's best interests."  "A party opposed to the proposed transfer may request a hearing," at which the party "must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child."[16]  "Party" is not a statutorily defined term, but as defined in the CINA Rules it includes "the child, the parents, the guardian, the guardian ad litem, [OCS], an Indian custodian who has intervened, an Indian child's tribe which has intervened, and *any other person who has been allowed to intervene by the court*."[17]

---

[13]    *Jensen D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 424 P.3d 385, 387 (Alaska 2018) (quoting *Burke v. Maka*, 296 P.3d 976, 980 (Alaska 2013)).

[14]    *See Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009), *as amended on reh'g* (Apr. 21, 2009).

[15]    *Lindbo v. Colaska, Inc.*, 414 P.3d 646, 651 (Alaska 2018) (quoting *Ben M.*, 204 P.3d at 1018).

[16]    AS 47.10.080(s).

[17]    CINA Rule 2(*l*) (emphasis added).

Intervention is governed by Alaska Civil Rule 24. We note that CINA Rule 1(e) lists Civil Rules that "apply to child in need of aid proceedings except to the extent that any provisions of these civil rules conflict with the Child in Need of Aid Rules," and Civil Rule 24 is not included in the list. But CINA Rule 1(g) further provides that "[w]here no specific procedure is prescribed by these rules, the court may proceed in any lawful manner, including application of the Civil Rules," so long as "[s]uch a procedure [is not] inconsistent with these rules and [does not] unduly delay or otherwise interfere with the unique character and purpose of child in need of aid proceedings." The CINA Rules explicitly allow intervention but "no specific procedure is prescribed" for it.[18] We have accordingly applied Civil Rule 24 to CINA proceedings.[19]

---

[18]     CINA Rule 1(g).

[19]     *See, e.g.*, *S.S.M. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 3 P.3d 342, 345 & n.8 (Alaska 2000) (citing Civil Rule 24(a) as allowing sister's intervention as of right in CINA case to argue for relative placement); *In re W.E.G.*, 710 P.2d 410, 416-17 (Alaska 1985) (citing Civil Rule 24(b) and concluding that grandparents should have been allowed to participate as parties in CINA proceedings), *superseded by statute on other grounds*, AS 25.23.130(c), *as recognized in In re A.F.M.*, 960 P.2d 602 (Alaska 1998); *In re J.R.S.*, 690 P.2d 10, 17 (Alaska 1984) (observing that when considering tribe's right to intervene in CINA case post-termination to contest foster parent adoption, "an analysis focused on the requirements of our Civil Rule 24 is appropriate"); *see also McGrew v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 106 P.3d 319, 320-21 (Alaska 2005) (noting superior court's grant of intervention in CINA case to grandparents and to woman who was mother's friend and child's babysitter); *Szarleta v. State, Dep't of Health & Soc. Servs.*, No. S-9569, 2000 WL 34546723, at *1 (Alaska Dec. 13, 2000) (affirming superior court's denial of godfather's motion for intervention in CINA case because godfather did not have "legal status necessary to ensure him intervention of right under Alaska Rule of Civil Procedure 24(a)" and "trial court did not abuse its discretion in denying permissive intervention under Civil Rule 24(b)").

Under Civil Rule 24, intervention may be permissive or as of right.[20] Douglas's foster parents argued both approaches, but the superior court limited its order to a grant of permissive intervention, which depends on a finding that "an applicant's claim or defense and the main action have a question of law or fact in common."[21] The superior court found that the foster parents' claim and the CINA case shared "the same questions of law and fact": what was in Douglas's best interests.

OCS argues that, as a matter of law, foster parents should not be able to intervene in ongoing CINA proceedings because it would contravene the language and purposes of the CINA statutes. We agree with much of OCS's policy argument even though we must reject the flat rule it proposes. We agree that allowing foster parents to intervene as a matter of course would be contrary to the goals of the CINA statutes, and courts should be hesitant to allow it. Among the primary purposes of the CINA statutes is "to preserve and strengthen the child's family ties unless efforts to preserve and strengthen the ties are likely to result in physical or emotional damage to the child."[22] OCS is therefore required to "search for an appropriate placement with an adult family member or family friend."[23]

---

[20]    Alaska R. Civ. P. 24(a)-(b). Intervention as of right depends on a showing that "the applicant claims an interest" in the action's subject matter, "the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest," and the applicant's interest is not otherwise "adequately represented by existing parties." Alaska R. Civ. P. 24(a).

[21]    Alaska R. Civ. P. 24(b).

[22]    AS 47.05.060 (stating the purpose of Title 47 as it relates to children).

[23]    AS 47.14.100(e); *see also* AS 47.14.100(e)(3)(A) (listing order of preference for placement, beginning with "an adult family member").

Yet because family reunification takes time, successful CINA cases often depend on the willingness of third parties to act as foster parents in the interim. We have observed that "[a] foster parent serves a vital but inherently temporary role in a child's life."[24] Foster parents are entrusted with the emotionally challenging task of providing love and care for what ideally — if the family reunification goals are met — will be a limited time. Foster parents often grow to love their foster children as their own. It is understandable that foster parents would want to advocate in the CINA case for what they see as a child's best interests, especially if their view differs from OCS's. But as OCS points out, not only is the agency itself tasked with pursuing the child's best interests, but the child's best interests may be represented separately by a GAL (as they are here), who is charged with bringing an independent perspective to OCS's decisions on placement and other matters. Foster parent intervention risks delay and complication, distracting from OCS's mandate of working toward family reunification.[25]

Foster parent intervention should therefore be the rare exception rather than the rule. We cannot conclude, however, that it is precluded as a matter of law. As noted

_____

[24]     *Osterkamp v. Stiles*, 235 P.3d 178, 187 (Alaska 2010).

[25]     *See, e.g.*, *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 836 n.40 (1977) ("[I]n theory foster care is intended to be only temporary, [and] foster parents are urged not [to] become too attached to the children in their care."); *id.* at 856 (Stewart, J., concurring) ("The New York Legislature and the New York courts have made it unmistakably clear that foster care is intended only as a temporary way station until a child can be returned to his natural parents or placed for adoption."); *Mager v. Sherman*, 20 A.D.3d 399 (N.Y. App. Div. 2005) ("Although foster parents often provide the same care, love, and support expected of biological or adoptive parents, the foster-family relationship is frequently temporary, contractual in nature, and carefully circumscribed by statute . . . ."); *In re Custody of A.C.*, 200 P.3d 689, 693 (Wash. 2009) (Johnson, J., concurring) ("Although emotional bonds form in temporary foster care with loving foster parents, the resulting ties must not be allowed to interfere with a parent's constitutional right to long-term custody.").

above, AS 47.10.080(s) allows any "party opposed to the proposed transfer" to request a hearing to prove that OCS's placement decision is not in the child's best interests. The legislature could have defined "party" narrowly in this context, but because it did not we apply the definition used in the CINA Rules,[26] where "party" includes "any other person who has been allowed to intervene by the court."[27] The phrase "any other person" will thus include foster parents when the court properly exercises its discretion to allow them to intervene.[28] The question becomes whether the court's grant of permissive intervention was an abuse of discretion under the circumstances of this case.

### 2. The superior court's grant of permissive intervention was not an abuse of discretion.

We conclude that the superior court did not abuse its discretion when it allowed the foster parents to intervene in this case for the limited purpose of challenging the decision to place Douglas with Cassidy.[29] First, because the foster parents were

---

[26] *See Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169-70 (2014) (relying on presumption that "Congress is aware of existing law when it passes legislation" to conclude that Congress, in enacting class action legislation, "used the terms 'persons' and 'plaintiffs' just as they are used in Federal Rule of Civil Procedure 20, governing party joinder" (quoting *Hall v. United States*, 566 U.S. 506, 516 (2012))); *cf. Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 913 (Alaska 2016) (noting rule of statutory construction "that the legislature is [presumed to be] aware of existing case law when it enacts or modifies the law").

[27] CINA Rule 2(*l*) (defining "party").

[28] *See Roberto F. v. Ariz. Dep't of Econ. Sec.*, 301 P.3d 211, 216 (Ariz. App. 2013) ("Clearly, the phrase 'any other person' [in juvenile court rule] is broad enough to include intervention by a foster parent."); *In re Zhang*, 734 N.E.2d 379, 383-84 (Ohio App. 1999) (construing phrase "any other person specifically designated by the court" in juvenile rule as allowing court "wide discretion" to name foster parents as parties).

[29] We note that the court's order granting intervention stated that the foster
(continued...)

identified as a "pre-adoptive foster placement" and attested to their desire to adopt Douglas, their claim did share a "question of law or fact" with the placement review: the child's best interests.[30] This is not to say, however, that every pre-adoptive foster parent is entitled to permissive intervention. A common question of law or fact, while required by Civil Rule 24(b), is not the only consideration stated in the rule: "In exercising its discretion the court shall [also] consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." If foster parents' only rationale for intervening is to explain their own attachment to the child and their plans for the child's future in contrast to those of the biological parent, their involvement will in most cases be more prejudicial than helpful to the process.

What sets this case apart is the foster parents' representation that they had specific evidence about *the proposed placement* that the court was not going to receive from any existing party. It is true that the foster father's affidavit submitted in support of the foster parents' intervention motion focused almost exclusively on the strength of their bond with the child and OCS's alleged failure to appreciate that bond. Many foster parents could make the same representations. But the foster father also asserted that "what little time [Douglas] has spent with the grandmother was detrimental to the boy"

---

[29]  (...continued)
parents were "permitted to intervene in any placement review hearing regarding [Douglas]." This was clearly overbroad; there may be future placement reviews in which the foster parents have nothing substantive to add beyond evidence of their own attachment to the child, which, as we explain below, should not be sufficient to justify their intervention. We caution courts to limit foster parent intervention to specific upcoming proceedings.

[30]  *See* AS 47.10.080(s) (authorizing transfer of child from one placement to another "in the child's best interests"); AS 25.23.120(c) (stating that final decree of adoption depends in part on determination that "the adoption is in the best interest of the person to be adopted").

and that Douglas's "interactions with the paternal grandmother have only resulted in severe setbacks emotionally and behaviorally as attested to by his teachers and therapists." The testimony at the hearing bore out this representation, as several of Douglas's professional caregivers testified about what they saw as Douglas's regression following his grandmother's visits.

Keeping in mind the purposes of the CINA statutes, we conclude that this is the rare CINA case in which it was not an abuse of discretion for the superior court to permit foster parent intervention to contest OCS's placement decision.

### 3. Allowing trial courts to exercise discretion in this context, within defined limits, finds support in cases from other jurisdictions.

We recognize that child protection laws across the country differ in important ways. Some state statutes require courts to allow foster parent intervention in child protection cases,[31] while others authorize intervention but leave the court discretion to deny it.[32] Some states allow foster parents themselves to petition for the termination

---

[31] *See, e.g.*, *C.W.B., Jr. v. A.S.*, 410 P.3d 438, 444 (Colo. 2018) ("After a child has been adjudicated dependent or neglected, [Colo. Rev. Stat. § 19-3-507(5)(a) (2017)] permits 'foster parents who have the child in their care for more than three months' and who have information or knowledge concerning the care and protection of the child to intervene in pending dependency and neglect proceedings as a matter of right."); *see also* N.Y. Soc. Serv. Law § 384(3) (McKinney 2018) ("[A foster parent] having custody [of a child] for more than twelve months, through an authorized agency, shall be permitted as a matter of right, as an interested party to intervene in any proceeding [involving the custody of the child].").

[32] *In re Phy. W.*, 722 A.2d 1263, 1264 (D.C. 1998) (noting that under D.C. law, trial court is specifically authorized "to designate a foster parent as a party" in neglect proceeding); *In re E.G.*, 738 N.W.2d 653, 655 (Iowa App. 2007) (stating that "[a] foster parent 'may petition the court to be made a party' to juvenile proceedings" but noting that "[t]he juvenile court is accorded a certain amount of discretion to deny intervention in proper cases" (quoting Iowa Code § 232.91(2) (2005))); *In re S.L.W.*, 529

(continued...)

of parental rights to a child in state custody.[33] In the absence of governing statutes, some courts have decided that foster parents should be allowed to intervene as a matter of course,[34] whereas others have decided that foster parent intervention is fundamentally

---

[32] (...continued)
S.W.3d 601, 615 (Tex. App. 2017) (explaining that foster parent who has cared for child for at least 12 months has standing to intervene in suits to terminate parental rights but that whether to allow intervention is still committed to trial court's discretion); *see also* Haw. Rev. Stat. § 587A-4 (2018) (providing that "party" in child protection statutes "may include any . . . person, including the child's current foster parent . . . , if the court finds that such person's participation is in the best interest of the child"); 705 Ill. Comp. Stat. 405/1-5(2)(d) (2018) ("The court may grant standing to any foster parent if the court finds that it is in the best interest of the child for the foster parent to have standing and intervenor status."); Ind. Code § 31-34-21-4.5 (2019) ("A foster parent . . . may petition the court to request intervention as a party to a [child in need of services] proceeding . . . .").

[33] *See, e.g.*, *Roberto F.*, 301 P.3d at 214 (involving foster parents who moved to intervene in state-initiated "dependency proceedings" and "also filed a separate termination petition seeking to sever [the biological parents'] parental rights"); *see also, e.g.*, *F.W. v. T.M.*, 140 So. 3d 950, 952 (Ala. Civ. App. 2013) (involving foster parents who moved to intervene in state-initiated "dependency case" and "also filed a separate petition for termination of the mother's parental rights"); *Cooper v. S.C. Dep't of Soc. Servs.*, 835 S.E.2d 516, 517 (S.C. 2019) (involving foster parents who initiated "private actions seeking termination of parental rights" and sought to intervene in state-initiated "removal actions").

[34] *See I.B. v. Dep't of Children and Families*, 876 So. 2d 581, 584 (Fla. Dist. App. 2004) (holding that "foster parents "clearly have standing to intervene" in post-termination placement proceedings (citing Fla. R. Civ. P. 1.230)); *In re Shelton*, 654 P.2d 487, 491 (Kan. App. 1982) (holding that civil rules allowed foster parent intervention, noting that "[t]here would be no reason to permit foster parents to request and receive notice of a hearing at which they could not present evidence"); *State ex rel. C.H. v. Faircloth*, 815 S.E.2d 540, 554 (W. Va. 2018) ("[A]t such time as termination appears imminent . . . , it is in the interests of all parties that the foster parents be recognized as occupying a critically important position relative to the child and that such position be
(continued...)

inconsistent with the goals of child protection proceedings.[35]

What appears to be the middle ground in this diverse case law — giving due weight to the arguments for and against foster parent intervention — is a reliance on Civil Rule 24(b) and its grant of trial court discretion.[36] As we emphasize above, that discretion must be exercised very cautiously in the CINA context. Other states' cases help us place some parameters around the trial court's discretion.

---

[34]    (...continued)
dignified with full intervenor status if sought.").

[35]    *See, e.g.*, *In re Doe*, 9 P.3d 1226, 1232-33 (Idaho 2000) (concluding that permissive intervention under Idaho Civil Rule 24(b) is inconsistent with Idaho's Child Protective Act and statutes governing termination of parental rights and should not be applied in such proceedings).

[36]    *See, e.g.*, *F.W.*, 140 So. 3d at 958 (finding no abuse of discretion in grant of intervention to foster parents to contest relative placement in dependency action); *Roberto F.*, 301 P.3d at 219 (finding no abuse of discretion in grant of intervention to foster parents in dependency proceeding); *In re G.H.*, 265 So. 3d 960, 965 (La. App. 2019) (explaining that although former foster parents lose their right to participate in case review and permanency proceedings, trial court retains discretion to allow their participation if necessary "to facilitate the permanent placement of the child and to [e]nsure that the best interests of the child are protected"); *In re Marcia L.*, 785 P.2d 1039, 1040-41 (N.M. App. 1989) (affirming trial court's denial of foster parent intervention as of right; reviewing denial of permissive intervention for abuse of discretion and affirming it on grounds that motion was technically deficient); *In re Baby Boy Scearce*, 345 S.E.2d 404, 409-11 (N.C. App. 1986) (affirming order granting foster parents permissive intervention in termination suit pursuant to North Carolina Civil Rule 24(b)); *In re Zhang*, 734 N.E.2d 379, 383-85 (Ohio App. 1999) (finding no abuse of discretion in grant of permissive intervention to foster mother in termination proceeding); *In re J.H.*, 815 P.2d 1380, 1385-86 (Wash. 1991) (holding that foster parent "intervention is within the juvenile court's informed discretion" but "would be appropriate only to the extent that the rights of the foster parents and the rights of the legal parents do not conflict"), *superseded by statute on other grounds,* Wash. Rev. Code § 13.34.100 (1993), *as recognized in In re E.H.*, 427 P.3d 587 (Wash. 2018).

In *Roberto F. v. Arizona Department of Economic Security* the trial court allowed foster parents to permissively intervene in a dependency proceeding pursuant to Arizona Rule of Civil Procedure 24(b).[37] The father whose rights were terminated appealed the intervention order, which the Arizona Court of Appeals affirmed.[38] The court began its analysis of the issue by explaining that foster parents are identified in the juvenile court rules as "participants" in dependency proceedings rather than "parties"; however, like Alaska's CINA rules, Arizona's juvenile court rules define "party" to include "a child, parent, guardian, [the child protection agency] or petitioner, and *any other person* or entity who has been permitted to *intervene* pursuant to [Arizona Civil] Rule 24."[39] Interpreting this rule, the court said, "Clearly, the phrase 'any other person' is broad enough to include intervention by a foster parent."[40]

Noting preliminarily that Arizona Civil Rule 24 is construed liberally "with the view of assisting parties in obtaining justice and protecting their rights,"[41] the court first noted that the foster parents made no claim to a right to intervene under Civil Rule 24(a); in fact, a juvenile court rule explicitly states that the foster parents' right to notice and the opportunity to be heard at proceedings involving foster children "shall *not* require that any foster parents . . . be made a *party* to such a proceeding."[42] The court

---

[37]    301 P.3d at 214-15.

[38]    *Id.* at 215-19.

[39]    *Id.* at 216 (emphasis in original) (quoting Ariz. R. Juv. Ct. P. 37(A)).

[40]    *Id.*

[41]    *Id.* (quoting *Bechtel v. Rose*, 722 P.2d 236, 240 (Ariz. 1986)).

[42]    *Id.* at 217 (alteration in original) (emphasis in original) (quoting Ariz. R. Juv. Ct. P. 41(1)(B)).

focused on permissive intervention under Civil Rule 24(b).[43] It concluded that "the trial court did not abuse its discretion in determining there were common issues of law and fact," because the child protection agency was pursuing not only reunification but also a "concurrent case plan of severance and adoption," issues shared by the foster parents' termination petition.[44]

Arizona case law required the court to then consider whether "intervention [was] in the child's best interests."[45] The court recognized that there were arguments on both sides. On the one hand, the court saw "[n]othing in the record" demonstrating that the existing "parties and participants, absent intervention by Foster Parents, were unable or unwilling to fully promote and protect the best interests of the Children."[46] On the other hand, the court acknowledged that the trial court could reasonably view the foster parents' "significant relationship with the Children and their desire to protect the Children" as potentially helpful in fully developing the relevant factual issues.[47] The court concluded: "When competing factors such as those discussed above guide a court's exercise of discretion, it is rare that an appellate court will find an abuse of discretion. Although we may not have made the same decision as the trial court, we are unable to find such an abuse of discretion here."[48]

---

[43] *See id.* at 216-18.

[44] *Id.* at 218.

[45] *Id.* (citing *Bechtel*, 722 P.2d at 241).

[46] *Id.* at 219.

[47] *Id.*

[48] *Id.*

Finally, the court considered the potential prejudice to existing parties if permissive intervention was allowed under Civil Rule 24(b).[49] Recognizing the importance of the father's interests and the clear prejudice he suffered by "fac[ing] a new adversarial party that was strongly opposed to reunification," the court nonetheless concluded that the trial court, in its discretion, could decide that any prejudice suffered by the father was outweighed by the children's best interests.[50]

The Ohio Court of Appeals applied similar rules in *In re Zhang* and found no abuse of discretion in a trial court's order permitting a foster mother to intervene in a parental-rights termination suit.[51] A county family services agency was granted temporary custody of a child and placed her in foster care, but the mother "abducted her child from the foster mother[] and absconded to the People's Republic of China."[52] The agency essentially gave up, moving to end its temporary custody and return custody to the now-absent mother.[53] The trial court granted the foster mother's motion to intervene and, following trial, terminated the mother's parental rights *in absentia* and granted legal custody to the foster mother.[54]

---

[49] *Id.* at 219-20.

[50] *Id.* at 220.

[51] 734 N.E.2d 379, 383-85 (Ohio App. 1999).

[52] *Id.* at 380-81.

[53] *Id.* at 381.

[54] *Id.*

On appeal the mother's GAL argued among other things that the trial court abused its discretion when it allowed the foster mother to intervene.[55] The appellate court first looked to the rules governing juvenile proceedings, which, similar to Arizona's and our own, defined "party" to include not only parents, the state, and GALs, but also "any other person specifically designated by the court."[56] The court observed that "[p]ursuant to this rule, a juvenile court has wide discretion in affording any individual party status."[57] The court continued: "While a foster parent is not automatically entitled to party status, . . . [the court's wide] discretion includes naming foster parents as parties."[58] Noting that in the case before it "the child welfare system failed miserably to protect the best interests of the child" — particularly in its "refusal to fight for the child after she had been abducted to China" — the court concluded that "[t]he foster mother's understandable bond with the child placed her in the position of being an advocate for the child when those who had that responsibility failed to execute [it]."[59] And "[w]ith that thought, the [trial] court could reasonably look to the foster mother as the only remaining defender of the child's best interests; consequently, the [trial] court did not abuse its discretion by permitting the foster mother to become a party to this action."[60]

---

[55] *Id.* at 383.

[56] *Id.* (quoting former Ohio R. Juv. P. 2(X), *recodified as* Ohio R. Juv. P. 2(Y)).

[57] *Id.* (quoting *In re Hitchcock*, 696 N.E.2d 1090, 1095 (Ohio App. 1996)).

[58] *Id.* at 384.

[59] *Id.*

[60] *Id.* at 385.

The Alabama Court of Civil Appeals considered the issue of foster parent intervention in *F.W. v. T.M.*[61] The child protection agency decided to move a child in state custody from the foster parents' home to the home of the child's great-aunt and great-uncle.[62] The foster parents moved to intervene in the pending dependency case, asking that the court prevent the move because of concerns about the relatives' health and their "close association with and location to family members and others who engaged in illegal or illicit activity."[63] Following trial, the juvenile court found that the child's great-aunt and great-uncle were not "fit" and "able," as required to give them statutory placement priority, due to their dangerous associations, health, age, and poor history as parents.[64] It found that it was in the child's best interests to award legal and physical custody to the foster parents instead.[65]

On appeal the relatives argued that foster parent intervention was precluded by the governing statutes, which provided that foster parents were entitled to notice of and the opportunity to be heard in "any juvenile court proceeding being held with respect to a child in their care."[66] The statute further provided: "No foster parent . . . shall be made a party to a juvenile court proceeding solely on the basis of this notice and right

---

[61]     140 So. 3d 950 (Ala. Civ. App. 2013).

[62]     *Id.* at 952.

[63]     *Id.*

[64]     *Id.* at 955-56.

[65]     *Id.* at 956.

[66]     *Id.* at 957 (quoting Ala. Code § 12-15-307 (1975)).

to be heard pursuant to this section."[67]  The appellate court rejected the relatives' argument, stating that "the plain language of [the Alabama statute] prohibits the court from making a foster parent . . . a party solely based on the rights established by the statute," "but the plain language of the statute does not prohibit a foster parent from petitioning to intervene in an action before the juvenile court."[68]

Permissive intervention was governed by Alabama Civil Rule 24(b), pursuant to which the Alabama court "has routinely recognized that relative caregivers and foster parents may seek and be granted intervention in a dependency action."[69]  The court concluded that both the foster parents and the relative caregivers were properly made parties to the dependency action under Civil Rule 24(b).[70]

The South Carolina Supreme Court addressed the issue in *Cooper v. South Carolina Department of Social Services*, holding that the family court erred by denying foster parents' motions to intervene in ongoing actions to remove children from their parents' custody.[71]  The state child protection agency took children from their home, placed them with foster parents, and began "removal actions" with the goals of termination of parental rights and adoption.[72]  When the agency informed the foster parents that the children would be removed abruptly from their care and placed with a great-uncle, the foster parents filed their own petitions for termination of parental rights

---

[67]     *Id.* (quoting Ala. Code § 12-15-307).

[68]     *Id.*

[69]     *Id.* at 958.

[70]     *Id.*

[71]     835 S.E.2d 516, 520-22 (S.C. 2019).

[72]     *Id.* at 518.

and adoption, also moving to intervene in the agency's removal actions.[73] The family court denied intervention, and the foster parents appealed.[74]

The supreme court began its analysis by noting that "[g]enerally, the rules of intervention should be liberally construed where judicial economy will be promoted by declaring the rights of all affected parties."[75] But the court held that foster parents had no absolute right to intervene based on their status as foster parents: their intervention could only be permissive, and the right to intervene arose, "if at all, through the evolution of a special relationship illustrated to the family court via the underlying facts of each individual case."[76] The court concluded: "A family court should therefore apply Rule 24(b)(2) when analyzing whether or not to grant a foster parent's motion to intervene."[77]

Applying the rule's standard, the court held that the foster parents had demonstrated that their private claims and the removal actions had "questions of law and fact in common": the best interests of the children, "especially when considering the length of time the Children have been with Foster Parents."[78] The court also concluded that "intervention [would] not unduly delay or prejudice the adjudication of the rights of

---

[73]    *Id.*

[74]    *Id.* at 520.

[75]    *Id.* (quoting *Ex Parte Gov't Emp.'s Ins. Co. v. Goethe*, 644 S.E.2d 699, 702 (S.C. 2007)).

[76]    *Id.* at 521.

[77]    *Id.* South Carolina Civil Rule 24(b)(2) permits intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." South Carolina law also specifically identifies foster parents as among those "[p]arties in interest" who are allowed to move to intervene in removal actions "pursuant to the rules of civil procedure." S.C. Code § 63-7-1700(J) (Supp. 2019).

[78]    *Cooper*, 835 S.E.2d at 521.

the parties to these [removal] actions."[79] While "stress[ing] that [its] decision . . . should not be interpreted as a signal to the family court bench and bar that intervention should be granted to foster parents in every case," the court concluded that "[t]he decision to grant intervention remains in the discretion of the family court following its analysis of the facts and procedural posture of each case."[80]

In *Valentine v. Lutz* the Minnesota Supreme Court considered the appeal of former foster parents who, attempting to recover custody from the biological mother's relatives, had been denied intervention in a protective services proceeding.[81] Although confirming that the foster parents had no right to intervene, the supreme court observed that "the trial court does have discretion to allow intervention of foster parents," particularly when they have "provide[d] excellent care for a child for an extended period" and "may have information which can assist a trial court in making its decisions in [child protection] proceedings."[82] The court concluded that whether to allow intervention is a decision "that should remain within the sound discretion of the trial court," "guided by the principle that '[t]he paramount consideration in all proceedings concerning a child alleged or found to be in need of protection or services is the best interests of the child.' "[83] The court found no abuse of discretion in the trial court's denial of intervention.[84]

---

[79]   *Id.* at 522.

[80]   *Id.*

[81]   512 N.W.2d 868, 869-70 (Minn. 1994).

[82]   *Id.* at 871.

[83]   *Id.* (alteration in original) (quoting Minn. Stat. § 260.011(2)(a) (1992)).

[84]   *Id.*

The Connecticut Supreme Court affirmed a denial of preadoptive parent intervention in *In re Baby Girl B.* while, like these other courts, emphasizing the discretionary nature of the trial court's task.[85] The mother sought to reopen the case post-termination, arguing that she had not received notice that she was losing her parental rights; the preadoptive parents moved unsuccessfully to intervene.[86] After reopening the case and holding a termination trial, the trial court approved a stipulated disposition "that provided for the return of the child to her mother, subject to the protective supervision of [the child protection agency] during the succeeding six months."[87]

On appeal the supreme court first decided that preadoptive-parent status did not justify intervention as of right "[w]hen the issue is the validity of the termination of a parent's rights to her child."[88] As for permissive intervention, the court began its discussion by emphasizing the breadth of the trial court's discretion: "Because questions of permissive intervention are committed to the sound discretion of the trial court, the preadoptive parents [bore] the heavy burden of demonstrating an abuse of that discretion if they [were] to prevail."[89] The court found that the preadoptive parents did not carry that burden.[90] It noted that preadoptive parent intervention tempts "judges or social workers, . . . consciously or unconsciously, to compare unfavorably the material

---

[85]   618 A.2d 1, 9 (Conn. 1992).

[86]   *Id.* at 5-6.

[87]   *Id.* at 7.

[88]   *Id.* at 8-9.

[89]   *Id.* at 9.

[90]   *Id.*

advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria."[91]   And because the preadoptive parents were attempting to intervene in a proceeding which "was concerned only with the statutory criteria alleged as grounds for terminating the mother's parental rights, [their] intervention would have been of little or no value to the court's decision on whether the grounds for termination had been proved."[92]

In following those courts that allow intervention in this context, we highlight our concerns with the trial courts' exercise of discretion under Alaska Civil Rule 24(b).  We agree with those courts that have cautioned against allowing foster parent intervention to devolve into a comparative assessment of the foster parents' and biological parents' fitness.[93]  Unlike some state laws,[94] our CINA statutes plainly do not contemplate private actions for the termination of parental rights to a child in state

---

[91]    *Id.* (quoting *In re Juvenile Appeal (Docket No. 10718)*, 449 A.2d 165, 167 (Conn. 1982)).

[92]    *Id.*

[93]    *See id.*; *State ex rel. C.H. v. Faircloth*, 815 S.E.2d 540, 550 (W. Va. 2018) ("[W]hen foster parents are involved in [abuse and neglect] proceedings . . . the circuit court must assure that the proceeding does not evolve into a comparison of the relative fitness of the foster parents versus the biological parents." (quoting *In re Jonathan G.*, 482 S.E.2d 893, 906 (W. Va. 1996))); *In re J.H.*, 815 P.2d 1380, 1385 (Wash. 1991) (holding that foster parent intervention may be appropriate "only to the extent that the rights of the foster parents and the rights of the legal parents do not conflict").

[94]    *See, e.g.*, Ariz. Rev. Stat. § 8-533(A) (2018) ("Any person or agency that has a legitimate interest in the welfare of a child, including . . . a foster parent . . . may file a petition for the termination of the parent-child relationship"); S.C. Code § 63-7-1710(A) (Supp. 2019) (providing that the State "shall join as party in a termination petition filed by another party").

custody;[95] we cannot currently conceive of a situation in which foster parent intervention in a CINA case would be appropriate when the foster parents' purpose was to argue for the termination of parental rights. The court's task when considering the termination of parental rights is carefully spelled out in statute and case law with an eye toward preserving the familial bond if at all possible,[96] and whether the children could have a better home in foster care is irrelevant to this determination.[97]

On the other hand, as this case demonstrates, the law should accommodate the rare case in which the trial court reasonably decides that foster parents have *relevant* evidence it is not likely to receive from the existing parties.[98] At the forefront of our analysis is the legislature's admonition that the CINA laws "shall be liberally construed" so that a child receives "the care, guidance, treatment, and control that will promote the

---

[95]     *See* CINA Rule 18(a) (stating "[OCS] may file a petition seeking termination of parental rights").

[96]     *See* AS 47.10.088; CINA Rule 18.

[97]     *See In re Baby Girl B.*, 618 A.2d at 9 ("[B]ecause the termination proceeding was concerned only with the statutory criteria alleged as grounds for terminating the mother's parental rights, the preadoptive parents' intervention would have been of little or no value to the court's decision on whether the grounds for termination had been proved."); *State ex rel. C.H.*, 815 S.E.2d at 549-50 ("The foster parents' involvement in abuse and neglect proceedings should be separate and distinct from the fact-finding portion of the termination proceeding . . . ." (quoting *In re Jonathan G.*, 482 S.E.2d at 906)).

[98]     *See, e.g.*, *Valentine v. Lutz*, 512 N.W.2d 868, 871 (Minn. 1994) (affirming denial of intervention, but observing that "trial court does have discretion to allow intervention of foster parents" who "may have information which can assist a trial court in making its decisions in [child protection] proceedings"); *In re Zhang*, 734 N.E.2d 379, 384-85 (Ohio App. 1999) (affirming intervention order in which trial court concluded that "[t]he foster mother's understandable bond with the child placed her in the position of being an advocate for the child when those who had that responsibility failed to execute [it]").

child's welfare and the parents' participation in the upbringing of the child to the fullest extent *consistent with the child's best interests*."[99]   When the cautious use of Civil Rule 24(b) permissive intervention is necessary to promote the child's best interest, the trial court has the discretion to employ it.

> **B.**   **The Superior Court Did Not Err In Finding That OCS's Placement Decision Was An Abuse Of Discretion.**

OCS indisputably has the statutory authority to direct the placement of children in its custody.[100]   And because one of the main purposes of the CINA statutes is to "preserve and strengthen" familial relationships when possible,[101] OCS follows statutorily defined placement preferences:  first, placement with an adult family member, then placement with a family friend, and, third, placement in a foster home.[102]   OCS "shall place the child" with an adult family member "in the absence of clear and convincing evidence of good cause to the contrary."[103]

But OCS's authority to direct placements is subject to judicial review.[104]

---

[99]   AS 47.10.005 (emphasis added); *Theresa L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 353 P.3d 831, 838 (Alaska 2015).

[100]   AS 47.10.080(c)(1); *In re B.L.J.*, 717 P.2d 376, 380 (Alaska 1986) (interpreting "AS 47.10.080(c)(1) as granting [OCS], not the superior court, the authority to direct placements of minors").

[101]   *See* AS 47.05.060.

[102]   AS 47.14.100(e)(3)(A)-(C); *see also* AS 47.10.080(s).  The fourth and final placement preference is "an institution for children that has a program suitable to meet the child's needs."  AS 47.14.100(e)(3)(D).

[103]   AS 47.14.100(e).

[104]   AS 47.10.080(s) ("A party opposed to the proposed transfer may request a hearing and must prove by clear and convincing evidence that the transfer would be

(continued...)

We review any contested factual findings for clear error,[105] overturning them only if we are "left 'with a definite and firm conviction that a mistake has been made.' Conflicting evidence is generally insufficient to overturn a fact finding, and we will not reweigh evidence if the record supports the court's finding."[106] "The trial court's factual findings enjoy particular deference when they are based 'primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.' "[107]

The superior court in this case properly approached its task with great caution, recognizing that to overrule OCS's placement decision would be extraordinary. In its written order following the evidentiary hearing, the court noted the statutory preferences for family placements, if they "can be done safely," and explained:

> There are very few situations where foster parents would have any colorable claim to contest OCS'[s] family-first placement authority. The parties recognize that interim/foster care and eventual permanent placement of CINA children subject to OCS custody are entrusted to the agency's reasonable discretion. Placement decisions are reviewed only for discretionary abuse and then only upon a very high

---

[104]    (...continued)
contrary to the best interests of the child for the court to deny the transfer."); *see Saul v. Alcorn*, 176 P.3d 346, 355 (Okla. 2007) ("The trial court's function is not to rubber stamp [the State's] placement plan.").

[105]    *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 220 (Alaska 2007).

[106]    *In re Hospitalization of Jacob S.*, 384 P.3d 758, 765-66 (Alaska 2016) (citation omitted) (quoting *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011)).

[107]    *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011) (quoting *Josephine B.*, 174 P.3d at 222)).

burden of proof (both by a preponderance of the evidence that OCS abused its discretion and clear and convincing evidence that the statutory preference for family-members is not in the child's best interest). Relevant Alaskan case law reveals that OCS placement decisions may be overturned only upon remarkable evidentiary demonstrations. This Court has never before had occasion to overturn an OCS placement decision. This matter, however, represents its first.

The court went on to conclude that the foster parents had met their burden of proving that OCS abused its discretion in deciding to place Douglas with Cassidy. The court summarized the findings supporting this conclusion: OCS had reached the placement decision "without meaningful consideration of the child's best interests and special needs"; the decision was "in direct opposition to professional recommendations and counseling"; the decision failed to ensure that Douglas "could continue to receive necessary services after the placement change"; and OCS had not properly vetted Cassidy "and her ability and desire to meet [Douglas]'s needs." The court extensively discussed the evidence in support of these findings.

On OCS's motion for reconsideration the court issued another order responding to several challenges to its fact-finding and reiterating some of its essential findings: that OCS should not have relied "so heavily" on the Texas ICPC study because it failed to take account of "the uniqueness of [Douglas]'s conditions, which require full-time parental, professional care and are some of the most extreme trauma-based behaviors observed by his teacher"; that OCS did not do enough to arrange appropriate therapies and other services in Texas; and that Cassidy "did not have an actual, realistic appreciation of [Douglas]'s special needs" or "the ability to understand and implement [Douglas]'s at-home . . . care." The court rejected OCS's argument that the court was simply substituting its judgment for OCS's, stating that it was instead carrying out the judicial task of oversight — determining whether OCS had abused its discretion.

### 1. The superior court did not clearly err in its challenged findings of fact.

OCS contends that several significant factual errors underlie the superior court's finding that OCS abused its discretion. First, OCS argues that the superior court "exaggerat[ed] Douglas's needs to a degree not supported by the record"; we interpret this as a challenge to the court's finding that Douglas "has significant mental, social, and physical needs, which require full-time, constant parental and professional supervision and care."

The superior court found the testimony of Douglas's preschool teacher "particularly convincing," and we defer to the superior court's credibility findings, especially when based on oral testimony.[108] The teacher testified that Douglas is "an extremely high-needs child" — "the most needy preschooler in the classroom" — and that he is "in the one percentile of children with the most extreme difficulties and challenging behaviors" she had seen in her career. She testified that she never had a student who presented with such extreme trauma, anxiety, and aggression. She testified that when she first met Douglas "[h]e had challenges in every area" and needed one-on-one support throughout each day. Even with several months of improvement he was "[f]or the school district[']s purposes . . . an intensive-funding student," meaning that he got "the highest level of supervision." If Douglas returned to her class after spending time in Texas with no "therapeutic involvement," she expected he would be "starting back at ground zero with extreme behavior 95% of the time." Given this testimony, we cannot say it was clearly erroneous for the superior court to find that Douglas had significant needs requiring full-time care.

---

[108] *Regina C. v. Michael C.*, 440 P.3d 199, 207 (Alaska 2019); *accord In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1264 n.22 (Alaska 2019).

Second, OCS argues that "the superior court clearly erred in finding that Cassidy is not capable of meeting Douglas's mental health and physical needs." Cassidy denied knowledge of the significant physical challenges, developmental delays, and emotional attachment issues identified by Douglas's professional care providers, or at least minimized their extent. She testified that she was only then beginning to read online about Douglas's challenges and had not sought advice from his foster parents or his care providers. The court noted that Cassidy's characterization of Douglas's challenges was in sharp contrast to that of the other adults in his life.

Douglas's preschool teacher and occupational therapist both expressed concerns about Cassidy's ability to care for Douglas. The teacher doubted that Cassidy had the skill set or physical ability to handle him. And the court noted the occupational therapist's testimony that Cassidy acted "contrary to therapeutic goals" even while under observation during a therapy session. Given all of the testimony — which was largely consistent when addressing either Douglas's challenges or Cassidy's ability to cope with them — we are not left with a definite and firm conviction that the court made a mistake in its assessment of Cassidy's capabilities, and we see no clear error.

OCS also disputes the superior court's finding that OCS disregarded "highly important" information relevant to the proposed placement. The court found that while relying heavily on the Texas ICPC study, which failed to take into account Douglas's special needs, OCS disregarded "highly important additional information from [Douglas]'s care providers that [bore] directly upon his needs." The court noted that those "care providers . . . documented serious developmental concerns" about Douglas and relayed their "profound apprehensions" about removing him from the foster parents'

care.[109]  The court also found that OCS did not give real consideration to the reported problems Douglas was having with his transition to Cassidy's care.  The evidence was sufficient to support a conclusion that the professional caregivers' perpectives were highly relevant and that OCS failed to give them due weight in its placement decision.  This finding is not clearly erroneous.

### 2.	The superior court did not err by finding that OCS abused its discretion in its placement decision.

Because we uphold the superior court's factual findings, we consider de novo whether those factual findings demonstrate that OCS abused its discretion in its placement decision.[110]  As the superior court appropriately emphasized, OCS is afforded an extremely high degree of discretion.  However, given the superior court's factual findings, we must agree with its further conclusion that OCS abused its discretion in its placement decision.

The superior court found that Douglas had "significant mental, social, and physical needs, which require full-time, constant parental and professional supervision and care."  It also found that Cassidy did "not have an appropriate understanding of [Douglas]'s challenges."  It found further that OCS "ignored . . . highly important

---

[109]	OCS argues that the court erred when it relied on the testimony of Douglas's pediatrician, teacher, and physical therapist "to show that OCS disregarded information available to it in deciding to place Douglas with Cassidy" because these individuals submitted information to OCS *after* OCS had already made the decision to place Douglas with Cassidy, and their input therefore could not have affected the decision.  We find this argument unpersuasive.  There is no question that OCS could consider additional information bearing on the child's best interests as it came in, especially if it showed that a decision already made should be reconsidered.

[110]	We have previously stated that we review the superior court's finding of an abuse of discretion for clear error.  *A.H. v. State*, 779 P.2d 1229, 1234 (Alaska 1989).  We clarify now that whether OCS abused its discretion is a mixed question of law and fact.

additional information from [Douglas]'s care providers that [bore] directly upon his needs" and that "OCS'[s] transition plan was not well informed."

OCS notes that it placed Douglas with Cassidy "because she had a positive ICPC study from Texas, had cared for Douglas for the first 15 months of his life, and interacted well with Douglas when she was alone with him." But the superior court found those reasons insufficient. The court found deficiencies in the ICPC study from Texas because the Texas social worker who created it "was not aware that [Douglas] had any special needs" and the ICPC study therefore failed to address Cassidy's ability to raise a special-needs child. The court also found a portion of Cassidy's testimony "to be entirely unreliable" when she "testified that [Douglas] does not have emotional outbursts while alone in her care." The court "found it entirely unbelievable, given [Douglas]'s history and the observations by every adult in [Douglas]'s life with the exception of [Cassidy], that [Douglas] no longer has outbursts or difficulties while in [Cassidy]'s care."

We must accept the court's factual findings as true, and the court's factual findings support the court's conclusion that OCS abused its discretion. We therefore affirm the superior court's finding.

## V.    CONCLUSION

We AFFIRM the superior court's order granting the foster parents' motion to stay OCS's placement proceedings.

WINFREE, Justice, with whom CARNEY, Justice, joins, dissenting.

I respectfully disagree with the court's ruling that a foster parent may intervene as a party in a child in need of aid (CINA) case. The ruling is inconsistent with the legislature's CINA statutory framework and the policies underlying the CINA family reunification goal. And the court's weak assertion that it is condoning intervention in only the rarest of cases is unpersuasive. Under the court's analysis, intervention requires no more than a representation that the foster parent has evidence the court would not otherwise obtain. But that analysis begs the question of a foster parent asserting a "claim" or "defense" in common with the placement hearing and ignores the foster parent's existing statutory rights to notice and to be heard at CINA hearings. And the court's attempt to limit discretionary intervention is flatly contradicted by the very nature of discretionary intervention and the subsequent deferential standard of review employed on appeal.

The real question raised in this appeal is whether a foster parent has the right to intervene in a CINA case to request a placement review hearing when a child's removal from the foster parent is contemplated; in my view, the answer is no. It thus was at least an abuse of discretion, if not legal error, to allow the foster parents in this CINA case to intervene as a party to request such a hearing.

**Brief Factual Orientation**

A child was removed from his family and placed with foster parents in 2017. OCS later determined he should be placed with an extended-family member in accordance with a statutory placement preference, but in early December 2018 the foster parents responded by moving to intervene in the CINA proceedings. The foster parents sought an order staying OCS's placement decision and making *them* the child's *permanent placement*, contending that they proposed "to submit evidence demonstrating that [the child's] best interests will be far better realized if allowed to remain with the

[foster parents]; the only *family* he has known for the last 16 months to which he has now fully bonded." (Emphasis in original.)[1] This was treated, in effect, as a motion for a placement review hearing.[2]

The superior court granted the foster parents' intervention motion, allowing intervention "in any placement review hearing regarding [the child]."[3] The court reasoned that because the foster parents were a "pre-adoptive foster placement," their opposition to the placement change "share[d] the same questions of law and fact as the underlying CINA proceeding, what is in the child's best interest."[4]

In late December 2018 and early January 2019, the superior court held the placement review hearing and granted the foster parents relief; the court rejected OCS's decision to place the child with the extended-family member. In mid-January —

---

[1] The court focuses on the foster parents' intervention to contest OCS's placement decision to move the child from the foster parents to an extended-family member. Op. at 21. But the foster parents' intervention motion was not so limited. As made clear by the foster parents' litigation of the case, they sought intervention to prevent OCS from removing the child from their home, prevent family reunification, and adopt the child.

[2] *See* AS 47.10.080(s) ("The department may transfer a child, in the child's best interests, from one placement setting to another . . . . A party opposed to the proposed transfer may request a hearing and must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child for the court to deny the transfer.").

[3] Although the court acknowledges that the superior court's order was "clearly overbroad" and that foster parents' intervention should be limited to "specific upcoming proceedings," the court inexplicably does not vacate the intervention order's "clearly overbroad" portion. Op. at 17-18, n.29.

[4] *See* Alaska R. Civ. P. 24(b) (authorizing discretionary intervention when intervener has "claim or defense" having "a question of law or fact in common" with action).

although parental rights had not been terminated — the foster parents petitioned to adopt the child. The superior court's written order for the placement decision was issued later that month.

**Recent Statutory Developments**

Responding to a decision by this court,[5] in 2016 the legislature enacted statutes regarding an adoption petition (or its proxy) for a child in state CINA custody.[6] As of 2017 such matters are heard as part of the CINA proceedings.[7] But the law is clear that a person who files an adoption petition or proxy "does not become a party to the [CINA] proceedings."[8] Notwithstanding the obvious implication from the legislature's actions that individuals having an interest adverse to the CINA statutes' family reunification policies should not be parties to a CINA proceeding, in this case the foster parents were allowed to intervene as parties when they were seeking to adopt the child. In contravention of the statute, they remained parties even after they formally petitioned to adopt the child.

**Preexisting Statutory Framework**

A thorough review of the preexisting statutory framework for foster parents' involvement in CINA cases similarly supports the conclusion that the legislature did not intend for foster parents to become parties to a CINA case. If a child already is

---

[5]   *See Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 334 P.3d 165, 172 (Alaska 2014) (holding that in CINA case covered by Indian Child Welfare Act (ICWA) court must "bar from consideration as an adoptive placement an individual who has taken no formal step to adopt the child").

[6]   Ch. 6, § 9, 4SSLA 2016. *See also* 2015 House Journal 975 (setting out in transmittal letter governor's rationale for proposed legislation).

[7]   AS 47.10.111(a); ch. 6, § 18, 4SSLA 2016 (stating effective date).

[8]   AS 47.10.111(d).

in a foster family placement, foster parents, like grandparents, must be given notice of a petition to place the child under the court's CINA jurisdiction.[9] Notice of a removal petition hearing also must be given to foster parents, like grandparents, and they are entitled to be heard at the hearing.[10] Foster parents are entitled to notice and a right to

---

[9] AS 47.10.030(b) ("In all cases under this chapter, the child, each parent, the tribe, *foster parent or other out-of-home care provider*, guardian, and guardian ad litem of the child and, subject to (d) and (e) of this section, *each grandparent of the child* shall be given notice adequate to give actual notice of the proceedings and the possibility of termination of parental rights and responsibilities . . . ." (emphases added)).

Alaska Statute 47.10.990(25) defines an "out-of-home care provider" to mean "a foster parent or relative other than a parent with whom the child is placed." The statute does not define "foster parent," but AS 47.10.990(12) defines "foster care" as "care provided by a person or household under a foster home license."

[10] AS 47.10.070(a) ("The court shall give notice of the hearing to the department . . . . The department *shall send notice of the hearing to the persons for whom notice is required under AS 47.10.030(b) and to each grandparent* of the child entitled to notice under AS 47.10.030(d). The department and the persons to whom the department must send notice of the hearing *are entitled to be heard* at the hearing." (emphases added)).

The remainder of AS 47.10.070 relates to subsequent hearings; subsection (e), providing that "grandparents" and "out-of-home care givers" may attend otherwise closed hearings, expressly contemplates that these individuals might testify at hearings. AS 47.10.070(e) ("The *grandparents of the child and an out-of-home care provider* may attend hearings that are otherwise closed to the public under (c) of this section. However, the court shall limit the presence of these persons in a hearing closed to the public to the time during which the person's testimony is being given if the court determines that the limitation is necessary under (c)(3) of this section." (emphasis added)).

CINA Rule 3, regarding hearings, dovetails with AS 47.10.070(a). Rule 3(a) provides: "Notice of each hearing must be given to all parties and any foster parent or other out-of-home care provider . . . ." Rule 3(c) provides that a "grandparent . . . and the out-of-home care provider are entitled to be heard at any hearing at which the
(continued...)

be heard at an initial permanency hearing[11] and at subsequent permanency hearings.[12] But only a limited group — not including foster parents or even grandparents — may request a permanency hearing.[13]

OCS may transfer a child from one placement to another if it is in the child's best interests,[14] but, for non-emergency transfers, OCS is required to give advance

---

[10]    (...continued)
person is present."

[11]    AS 47.10.080(*l*) ("Within 12 months after the date a child enters foster care as calculated under AS 47.10.088(f), the court shall hold a permanency hearing. The hearing and permanent plan developed in the hearing are governed by the following provisions: (1) *the persons entitled to be heard under AS 47.10.070* or under (f) of this section *are also entitled to be heard at the hearing held under this subsection*; . . . ." (emphases added)).

[12]    AS 47.10.080(f) ("The persons entitled to notice under AS 47.10.030(b) and the grandparents entitled to notice under AS 47.10.030(d) are entitled to notice of a permanency hearing under this subsection and are also entitled to be heard at the hearing."). CINA Rule 17.2(b), regarding permanency hearings, provides that OCS shall "notify the foster parent or other out-of-home care provider of the time set for the hearing and the right to participate in the hearing."

[13]    AS 47.10.080(f) ("[OCS], the child, and the child's parents, guardian, and guardian ad litem are entitled, when good cause is shown, to a permanency hearing on application.").

[14]    AS 47.10.080(s) ("The department may transfer a child, in the child's best interests, from one placement setting to another, and the child, the child's parents or guardian, *the child's foster parents or out-of-home caregiver*, the child's guardian ad litem, the child's attorney, and the child's tribe are entitled to advance notice of a nonemergency transfer. A party opposed to the proposed transfer may request a hearing and must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child for the court to deny the transfer." (emphasis added).

notice to, among others, "the child's foster parents or out-of-home caregiver."[15]  The governing statute also provides:  "A party opposed to the proposed transfer may request a hearing and must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child for the court to deny the transfer."[16]  CINA Rule 19.1(b) similarly provides that "a party who is opposed to" a placement transfer "may move the court for a review hearing."

The CINA statutes do not define "party."  But the CINA rules do:  " 'Party' means the child, the parents, the guardian, the guardian ad litem, the Department, an Indian custodian who has intervened, an Indian child's tribe which has intervened, and any other person who has been allowed to intervene by the court."[17]  Neither a grandparent nor a foster parent is included in the definition of "party"; neither the statute nor the rule expressly mentions foster parents as people who may oppose a placement transfer.

But AS 47.14.100 is instructive; subsection (e) sets out placement preference priority for children removed from a parent's home, and subsection (m) provides that an adult family member — including a grandparent[18] — who is denied

---

**15**     *Id.*; *see also Paula E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 422, 431 (Alaska 2012) ("Alaska Statute 47.10.080(s) provides that foster parents are entitled to notice of non-emergency transfers of children for whom they are caring . . . .").

**16**     AS 47.10.080(s).

**17**     CINA Rule 2(*l*); *cf.* 25 U.S.C. § 1911(c) (2018) ("In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.").

**18**     AS 47.10.990(1)(A) defines "adult family member" as "a person who is 18
(continued...)

placement is entitled to notice of the denial reasons and the right to request a review hearing, but not to appointed counsel for such a hearing.[19] And CINA Rule 19.1(e) similarly provides that an adult family member or family friend who has been denied placement may request a placement review hearing without being "required to intervene" in the proceeding; in that context the adult family member or family friend's participation in the case is limited to being a "participant in the hearing concerning the denial of placement."[20] No similar provision exists for a foster parent denied placement or from whom a placement transfer is proposed.

Where does all this lead, in my view? A foster parent may participate in many aspects of a CINA case, but not as a party. The statutory framework is designed specifically to *not* allow a foster parent to become a party to CINA proceedings. Why would a foster parent generally be able to intervene as a party in CINA proceedings when by statute a foster parent filing an adoption petition specifically is denied party status?[21] And it seems particularly noteworthy that the legislature took care to give the

---

[18]     (...continued) years of age or older" and "related to the child" in specified ways, including, among others, a "grandparent."

[19]     *See Irma E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 312 P.3d 850, 853-54 (Alaska 2013) (discussing history of AS 47.14.100(m) and concluding it required that grandmother denied placement had right to placement review hearing); *Paula E.*, 276 P.3d at 431 ("AS 47.14.100(m) provides that grandparents are entitled to notice of the right to appeal an OCS decision not to place a child with them.").

[20]     CINA Rule 19.1(e). *See also Paula E.*, 276 P.3d at 428 (noting, in passing, that grandmother's tribe attempted to intervene in CINA case but was granted only "participant" status by trial court).

[21]     This should dispense with the notion that the foster parents had some sort of weightier standing because they were a potential adoptive placement or because they
(continued...)

right of judicial review to a grandparent who has been denied placement — as a participant but not as a party to the CINA proceedings — but took no similar action for foster parents losing a placement due to OCS's authority to make placement transfers.

**Intervention Under Alaska Civil Rule 24**

With this in mind, foster parent intervention under Alaska Civil Rule 24 makes no sense. First, Rule 24(a)'s intervention of right requires the proposed intervener to claim "an interest relating to the property or transaction which is the subject of the action" and to be situated such that lack of party status will "as a practical matter impair or impede" the proposed intervener's ability to protect its interests. Foster parents do not have a property or other legally protected interest in a child under state custody in a CINA case. They may have a general interest in a child's best interests — or perhaps a general interest in stopping family reunification if they wish to adopt a child — but this is insufficient for intervention as a right. And although foster parents may have contractual or financial relationships with OCS, administrative avenues for resolving contractual disputes preclude the need for litigating them in the CINA proceedings.[22]

---

[21]    (...continued)
petitioned to adopt. We rejected this argument in *Dara S. v. State, Department of Health & Social Services, Office of Children's Services*, 426 P.3d 975, 999 (Alaska 2018), when we held that " 'permanent,' 'pre-adoptive,' or 'adoptive' " were nothing other than descriptive labels for foster placements.

[22]    *See generally* 7 Alaska Administrative Code 53, arts. 1, 3 (providing for financial reimbursement to foster parents); ALASKA OFFICE OF CHILDREN'S SERVICES, CHILD PROTECTIVE SERVS. MANUAL § 1.16 (rev. July 1, 2020), http://dhss.alaska.gov/ocs/Documents/Publications/CPSManual/cps-manual.pdf (setting out administrative appeal process for foster parents' payment and reimbursement disputes). That OCS pays foster parents to care for a child appears to create a financial incentive for foster parents to oppose reunification with relatives, creating an additional layer of conflict and providing yet another reason to not grant foster parents party status.

Second, Rule 24(b)'s permissive intervention requires that a proposed intervener's "claim or defense" have a question of fact or law in common with "the main action." Foster parents have no claim in common with the CINA proceedings; foster parents are not subject to adverse claims that could give rise to a defense in common with the CINA proceedings. It is not enough to say that a foster parent in an "adoptive placement" has a claim in common with the CINA proceedings and that the child's best interests are common to the CINA proceedings and the foster parent's adoption effort.[23] The legislature already has rejected the common claim notion. And two separate, but not common, best interests inquiries are obvious in this context: whether it is in the child's best interests that parental rights be terminated or that the child be placed with a family member, and whether it is in the child's best interests that instead the child be placed and ultimately adopted by the foster parents. Turning these two best interests findings into a comparative analysis of the parents' and foster parents' parenting abilities will lead to improper CINA determinations;[24] a foster parent cannot act as a private attorney general seeking to establish that the child's best interests require action designed to interfere with family placements and family reunification.

---

[23] *Cf. Dara S.*, 426 P.3d at 999 (rejecting notion that " 'permanent,' 'pre-adoptive,' or 'adoptive,' " placement designations have legal meanings beyond obvious foster parent designation).

[24] At the early stages of the CINA proceedings the foster parents will almost always provide a better home for the child than the parent or parents from whom the child was recently removed. Allowing foster parents to intervene in the CINA proceedings before parental rights have been terminated threatens to impose an additional burden for parents seeking reunification, requiring the court to determine under whose care the child's full potential is most likely to be met. *See In re S.A.*, 912 P.2d 1235, 1237-38 (Alaska 1996), *superseded on other grounds by statute*, ch. 99, § 1(b)(2)(A), SLA 1998 (rejecting in CINA adjudication context argument that children would not have sufficient "structure and consistency" allowing them to "meet their potential" if returned to mother).

When weighing proposed discretionary intervention, the superior court is to "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."[25] This brings into play the CINA statutes' underlying policies: AS 47.10.005 directly indicates the purpose of CINA proceedings by explaining that CINA statutes "shall be liberally construed to . . . promote the child's welfare and the parents' participation in the upbringing of the child to the fullest extent consistent with the child's best interests."

As OCS points out, CINA proceedings are brought to protect a child from parental harm and to determine the rights of parents to a continued relationship with the child.[26] OCS has a duty to search for appropriate adult family members or family friends for a child's placement before placement with a foster parent.[27] OCS has a duty to make efforts to reunify the family.[28] Foster parents have a duty to temporarily care for a child while CINA proceedings are pending.[29] Allowing foster parents to intervene as parties to request placement hearings and challenge OCS's performance of duties — when neither a parent nor the guardian ad litem challenges OCS's performance — will prejudice parents' rights in, unduly delay, and unnecessarily expand CINA litigation.

---

[25] Alaska R. Civ. P. 24(b).

[26] *See* AS 47.10.011 (setting out bases for finding that child is a child in need of aid); AS 47.10.050 (providing for appointment of guardian ad litem to promote child's welfare); AS 47.10.088 (regarding involuntary termination of parental rights).

[27] AS 47.14.100(e).

[28] AS 47.10.086 (articulating reasonable efforts requirement); 25 U.S.C. § 1912(d) (2018) (articulating active efforts requirement in cases under ICWA, 25 U.S.C. §§ 1901-1963).

[29] AS 47.10.084(d); *Osterkamp v. Stiles*, 235 P.3d 178, 187 (Alaska 2010) ("A foster parent serves a vital but inherently temporary role in a child's life.").

This case exemplifies why allowing foster parents to intervene in a CINA proceeding is inappropriate. OCS provided this court subsequent court filings reflecting that: (1) OCS later intended to place the child with his mother, but the foster parents sought a placement review hearing to stay placement with the mother and keep preferential placement of the child; and (2) the foster parents sought production of OCS's and the guardian ad litem's records, including the mother's confidential counseling records, and to require the mother and the child to undergo physical and mental examinations.[30] The court *granted* the foster parents' discovery motion in part, requiring production of documents for the court's in camera review, although the court denied, without prejudice to a later motion after the foster parents reviewed discovery responses, the motion for physical and mental examinations of both the child and the mother. The foster parents now are prosecuting the CINA case and attempting to terminate the parents' rights, while OCS is attempting to comply with its family reunification duties. This is untenable.

**Conclusion**

Foster parents have the right to notice of CINA case hearings, including placement review hearings, and the right to appear and be heard. Foster parents have the right and the ability to present views on the child's best interests in the context of a motion or hearing at issue. But foster parents have no right to become parties — perhaps even with court-appointed counsel at public expense — to request a placement review hearing in a CINA case. The superior court's intervention order should be vacated.

---

[30] *Cf.* AS 47.10.080(q) (outlining information required to be given to foster parents).