*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

BLYTHE P., )
)
                 Appellant, )
)
     v. )
)
STATE OF ALASKA, DEPARTMENT )
OF HEALTH & SOCIAL SERVICES, )
OFFICE OF CHILDREN'S SERVICES, )
)
                 Appellee. )
)

Supreme Court No. S-18296

Superior Court No. 4FA-21-00016 CN

O P I N I O N

No. 7641 – February 10, 2023

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Earl A. Peterson, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. David A. Wilkinson, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Margaret McWilliams, Assistant Public Advocate, Juneau, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Borghesan, and Henderson, Justices. [Carney, Justice, not participating.]

BORGHESAN, Justice.

## I. INTRODUCTION

When the Office of Children's Services (OCS) decides to transfer a child in its custody from one out-of-home placement to another, a party may seek judicial review of that decision. According to statute, the superior court shall deny the proposed transfer if the party "prove[s] by clear and convincing evidence that the transfer would be contrary to the best interests of the child."[1] OCS argues that in some circumstances the party challenging a proposed transfer must also show it is an abuse of discretion, such as when OCS seeks to transfer the child to a statutorily preferred placement[2] or due to licensing concerns with the existing placement.[3] Because there is no basis in statutory text or legislative history to supplant the standard of review chosen by the legislature with a standard more deferential to OCS, we decline to do so. And because we mistakenly applied abuse of discretion review in *State, Department of Health & Social Services, Office of Children's Services v. Zander B.*,[4] we overrule that decision to the extent it is inconsistent with this opinion.

---

[1]    AS 47.10.080(s).

[2]    *See* AS 47.14.100(e) (describing legislative preferences for out-of-home placement of children in OCS custody, including placement with adult family member or with family friend who meets foster care licensing requirements).

[3]    *See* AS 47.14.100(e)(3) (authorizing OCS to place child with adult family member, family friend "who meets the foster care licensing requirements established by" OCS, and "licensed foster home"); *see also* AS 47.32.030(a) (giving OCS authority to develop licensing policy and enforce licensing requirements).

[4]    *See* 474 P.3d 1153, 1173-74 (Alaska 2020).

## II.   FACTS AND PROCEEDINGS

### A.   Facts

Blythe and Danny are the parents of three-year-old Gene.[5]  Blythe has two other children, Gene's half siblings, with a man named Timothy.  Timothy has custody of those other children; they live with him and his parents, Robert and Vivian.

In January 2021 OCS filed a non-emergency petition to adjudicate Gene a child in need of aid due to concerns about Blythe's and Danny's mental health and substance abuse.  Later that month OCS removed Gene from his parents and placed him with Robert and Vivian.  Robert and Vivian consider themselves Gene's grandparents, though they are not related to him by blood or marriage.  At the time they agreed to care for Gene they did not know what being a licensed foster parent entailed.  But they expressed willingness to do what was necessary to ensure Gene's safety.

Because Robert and Vivian were not legally related to Gene, they were required by law to obtain a foster care license.[6]  They applied for an emergency license, listing Timothy and his two children as household members.  Timothy, who had been living with his two children at his parents' house, had a criminal history that included barrier crimes.  OCS's licensing division informed Robert and Vivian that Timothy could not live in their home unless they received a variance.[7]  Timothy agreed to live in an apartment above his church.  OCS then approved Robert and Vivian's emergency foster care license.

---

[5]   We use pseudonyms to protect the family's privacy.

[6]   *See* AS 47.32.020 (requiring license for all foster homes unless exemption applies); *see also* 7 Alaska Administrative Code (AAC) 50.010(a)(6) (2022) (creating exemption to foster home licensing requirement for individuals caring for a relative).

[7]   *See* AS 47.05.310(a)(3)-(4) (prohibiting someone who has committed a barrier crime from residing at or being present in a foster home); *see also* 7 AAC 10.905 (listing barrier crimes); 7 AAC 10.930 (providing for variances for individuals who have committed barrier crimes).

OCS's initial assessment caseworker reviewed the foster care rules and requirements with Robert and Vivian. The caseworker initially permitted Timothy to transport Gene to and from appointments and visitation to help support Robert and Vivian. But OCS licensing took the position that Timothy could not be around Gene without supervision due to his barrier crimes.

In May OCS licensing began investigating concerns that Timothy continued to have unsupervised contact with Gene. Later that month Timothy brought Gene to a visit, where the new caseworker observed that Gene seemed "more lethargic" and had a mark on his head that concerned her. Worried that Gene may have suffered a head injury, the caseworker contacted Vivian. Vivian said she was out of town, but that a babysitter, Robert, and Timothy were caring for Gene and that he had fallen off a swing. The caseworker then reminded Timothy that he could not transport Gene alone; in response, Timothy became "extremely upset."

Beginning to suspect that Robert and Vivian were "not aligned" with OCS and were not being truthful, the caseworker and an OCS licensing specialist visited Robert and Vivian's home unannounced. Nobody answered the front door. The OCS workers heard a door slam, which sounded like it came from a recreational vehicle in the back of the property. Then they saw Timothy coming toward them. Thinking Timothy looked angry, and feeling unsafe, both OCS workers left the property.

The caseworker and the licensing specialist called Vivian, who was out of town at the time. According to the OCS workers, Vivian stated that Timothy was living in the recreational vehicle and used the home only to cook, use the toilet, and visit the children when someone else was home. Vivian said she was not aware that Timothy was not allowed to live on the property. The licensing specialist explained to Vivian that Timothy's living on the property was a violation of the foster care rules.[8]

---

[8]    *See* AS 47.05.310(a)(3).

OCS removed Gene from Vivian and Robert's home. It transferred Gene to Kathryn, a cousin by marriage on his father's side of the family. OCS licensing then closed Robert and Vivian's foster care license.

## B. Proceedings

In early June 2021 Blythe sought judicial review of Gene's placement transfer under Child In Need Of Aid (CINA) Rule 19.1(b).[9] Blythe argued that it was not in Gene's best interests to be separated from his siblings and familiar caretakers. Blythe also challenged OCS's characterization of Kathryn as an adult family member and therefore preferred placement[10] because Kathryn is not biologically related to Gene.

Robert, representing himself, then filed a motion to challenge the placement transfer. A week later Robert, Vivian, and Timothy, represented by counsel, moved to join Blythe's challenge to the placement transfer. They argued that Gene's removal from their care was not in his best interests because he had a close bond with them. They also argued that due to Gene's close bond with his half-siblings, transferring him violated OCS's policy to keep siblings together.

The superior court held a multi-day placement review hearing over five months. In closing Blythe argued there was clear and convincing evidence that the transfer was contrary to Gene's best interests and that OCS had not made reasonable efforts to place the siblings together. Vivian and Robert argued that removing Gene from Robert and Vivian's home based on Timothy's presence was an abuse of

---

[9]     CINA Rule 19.1(b) provides that "[a]t any time in a proceeding, a party who is opposed to the Department transferring a child from one placement to another may move the court for a review hearing at which the requesting party must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child."

[10]     *See* AS 47.14.100(m) (granting adult family members and family friends denied placement the right to notice of basis for denial "and the right to request a [judicial] hearing to review the decision"); *see also* AS 47.14.100(e)(3) (establishing placement preference for adult family members and family friends).

discretion because OCS had represented to them that a variance was unnecessary for Timothy to live on their land and transport Gene.

The superior court affirmed OCS's decision. The court's written order contained two separate conclusions.

First, the court determined that OCS did not abuse its discretion when it removed Gene from Vivian and Robert's home. Applying the statutory placement preferences, the court determined that Kathryn was an adult family member and Robert and Vivian were family friends. Based on those classifications the court ruled that Kathryn had legal priority over Vivian and Robert and that Vivian and Robert failed to show clear and convincing evidence of good cause to deviate from this placement preference.[11]

Second, the court ruled that placement with Kathryn was "appropriate" and in Gene's best interests. The court found that Gene was "doing well" in Kathryn's home. It found that Kathryn allowed Gene to spend more time with his father and that Gene was having quality time with his half-siblings. The court also found that it would not be good to "bounce [Gene] from one placement to another."

Blythe appeals the court's decision to affirm the placement transfer.[12]

## III. STANDARD OF REVIEW

This appeal primarily concerns the standard a court must apply when reviewing OCS's proposal to transfer a child in its custody from one out-of-home placement to another. This is an issue of statutory interpretation and therefore a

---

[11] *See* AS 47.14.100(e) (requiring OCS to place child, "in the absence of clear and convincing evidence of good cause to the contrary . . . with, in the following order of preference, (A) an adult family member; (B) a family friend who meets the foster care licensing requirements").

[12] Robert and Vivian did not appeal the superior court's decision affirming OCS's decision to deny them placement.

question of law, which we review de novo, "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy."[13] Whether a superior court's factual findings satisfy the applicable requirements of the CINA statutes and rules is reviewed de novo.[14]

## IV. DISCUSSION

### A. Regardless Whether This Case Is Moot, We Address The Merits Under The Public Interest Exception To The Mootness Doctrine.

OCS argues this appeal is moot because Gene was placed in a trial home visit with his father while the appeal was pending. "A claim is moot if it is no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if it prevails."[15] OCS points out that even if we reversed the superior court's order upholding the placement transfer, Blythe would not obtain the relief she seeks because Gene would remain with his father.[16]

We need not decide whether this claim is moot because, even if it were, we would decide it on public interest grounds.[17] "[W]e use our discretion to determine whether the public interest dictates that immediate review of a moot issue is

---

[13] *See State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Zander B.*, 474 P.3d 1153, 1162 (Alaska 2020).

[14] *Diego K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 411 P.3d 622, 627 (Alaska 2018).

[15] *Mitchell v. Mitchell*, 445 P.3d 660, 663 (Alaska 2019) (citations omitted).

[16] The record does not indicate the status of the trial home visit, and the parties have not provided further updates on Gene's placement status since oral argument.

[17] *In re Off. of Pub. Advoc.*, 514 P.3d 1281, 1285 (Alaska 2022) ("[W]e may address certain issues if they fall within the public interest exception to the mootness doctrine." (quoting *Akpik v. State, Off. of Mgmt. & Budget*, 115 P.3d 532, 535 (Alaska 2005))).

appropriate."[18]   The public interest exception to mootness requires that we consider three factors:  "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine."[19]  No one factor is dispositive.[20]

The question presented here meets all three factors of the public interest exception.  First, the proper standard of review for OCS's decision to transfer a child from one placement to another is an issue that will arise frequently.

Second, this issue is likely to routinely evade review because foster care placements are inherently temporary and typically brief.  A placement dispute is mooted when the child is reunified with a parent or transferred to yet another placement. And if parental rights are terminated, then a parent challenging a placement transfer will lose standing to pursue the challenge.[21] Therefore most challenges to placement transfers will become moot before they can be resolved on appeal.  If we strictly applied the mootness doctrine, the question of the proper standards for placement transfers would routinely evade review.

---

[18]      *Fairbanks Fire Fighters Ass'n, Loc. 1324 v. City of Fairbanks*, 48 P.3d 1165, 1168 (Alaska 2002).

[19]      *In re Off. of Pub. Advoc.*, 514 P.3d at 1285.

[20]      *Fairbanks Fire Fighters Ass'n, Loc. 1324*, 48 P.3d at 1168.

[21]      *See* AS 47.10.080(s); CINA Rule 19.1(b) (permitting a party opposed to the transfer of the child to move for review); CINA Rule 2(k)-(*l*) (defining "party" to include parents only if their parental rights have not been terminated).

Third, we have previously held that clarifying the standards governing child placement is important to the public interest.[22] The issue presented in this case is of similar importance. Therefore we address the merits of this issue.

## B. The Failure To Consider Whether The Transfer Was Contrary To The Child's Best Interests Was Error.

OCS's decision to move Gene from Robert and Vivian's care to Kathryn's care spawned two distinct legal challenges. Blythe, a party to the CINA proceeding, moved to challenge the placement *transfer* as authorized by AS 47.10.080(s) and CINA Rule 19.1(b).[23] Robert and Vivian are not parties to this CINA proceeding, but as "family friends" they were authorized to challenge OCS's placement *denial* with them under AS 47.14.100(m) and CINA Rule 19.1(e).[24] Although in this case these challenges arise out of the same decision, they are governed by different rules and standards.

Blythe, appealing the order that rejected her challenge to the placement transfer, argues that the superior court erred by failing to apply the standard described in AS 47.10.080(s) and CINA Rule 19.1(b): whether she showed by "clear and convincing evidence that the transfer would be contrary to the best interests of the

---

[22] *See e.g.*, *Jennifer L. v. State, Dep't of Health & Soc. Servs.*, 357 P.3d 110, 114 (Alaska 2015); *Peter A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 146 P.3d 991, 996 & n.30 (Alaska 2006).

[23] CINA Rule 19.1(b) gives effect to AS 47.10.080(s) by permitting "a party who is opposed to the Department transferring a child from one placement to another [to] move the court for a review hearing at which the requesting party must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child."

[24] CINA Rule 19.1(e) gives effect to AS 47.14.100(m) by allowing "a child's adult family member or family friend" denied placement to request a hearing to review OCS's decision to deny placement. *See* CINA Rule 19.1(e). "The adult family member or family friend's participation in the case is limited to being a participant in th[at] hearing . . . ." *Id.*

child." She maintains that the court reviewed OCS's decision only for abuse of discretion, which is the correct standard of review for a placement denial but not for a placement transfer.

In response OCS makes two main arguments. First, it argues that the superior court did apply the clear and convincing evidence standard. Second, it argues that the standard is not controlling in all situations. OCS argues that when it seeks to transfer a child to a placement with higher priority under AS 47.14.100(e) or because the existing placement's conduct violates foster care licensing requirements, the party challenging the transfer must make an additional showing: that the proposed transfer is an abuse of OCS's discretion. For support OCS points to our decision in *Zander B.*, which applied abuse of discretion review when intervening foster parents challenged OCS's decision to transfer the child from their care to the child's grandmother.[25] According to OCS, Blythe needed to show that Gene's transfer was an abuse of discretion. Because the court ruled it was not an abuse of discretion, any failure to apply the separate clear and convincing standard was harmless.

We begin by examining the superior court's decision and conclude that it did not apply the clear and convincing evidence standard described in AS 47.10.080(s). We then proceed to consider whether it was correct to apply abuse of discretion review in these circumstances, as OCS maintains. Because the *Zander B.* decision did not explain why it applied abuse of discretion review to the placement transfer at issue, we begin our analysis by examining the text and legislative history of relevant statutes. We ultimately conclude that the legislature intended the clear and convincing evidence standard to apply to all placement transfers and did not intend this standard be supplanted by the more-deferential abuse of discretion standard in the circumstances OCS suggests. Then, having concluded that *Zander B.*'s use of abuse of discretion

---

[25] 474 P.3d 1153, 1173-74 (Alaska 2020).

review was originally erroneous, we overrule it to the extent inconsistent with this opinion.

### 1. The superior court did not expressly consider whether placement transfer would be contrary to Gene's best interests.

OCS argues that the superior court applied the clear and convincing evidence standard. It points out that the court had to consider both Robert and Vivian's challenge to placement denial (governed by AS 47.14.100(m)) and Blythe's challenge to placement transfer (governed by AS 47.10.080(s)) and that the court's order discussed each challenge separately. Regarding the transfer challenge, OCS argues the court found that it was in Gene's best interests to stay in Kathryn's custody. OCS argues that by analyzing Gene's best interests, the court satisfied the requirements of AS 47.10.080(s).

But the superior court did not consider Gene's best interests in the way required by AS 47.10.080(s). It focused on whether *staying* with Kathryn after the transfer had *already* been made was in Gene's best interests. The court considered whether Kathryn was the better placement and whether moving Gene a second time, back to Robert and Vivian, would be best for Gene. Yet nowhere did the court discuss the effect of moving Gene from Robert and Vivian to Kathryn. It did not mention how changing caregivers would impact Gene. And its two-part analysis did not apply the correct standard of review: clear and convincing evidence. We therefore disagree with OCS's assertion that the court's findings satisfy AS 47.10.080(s).

Although OCS is correct that we will "normally assume that the superior court has applied the correct standard,"[26] we cannot do so here. The court expressly applied the wrong standard when discussing the decision to move Gene and failed to

---

[26] *Wasser & Winters Co. v. Ritchie Bros. Auctioneers*, 185 P.3d 73, 83 (Alaska 2008).

focus on the move's effect on Gene when it did consider Gene's best interests. Because the court did not correctly apply AS 47.10.080(s), we must decide whether doing so was necessary in this case.[27]

### 2. When OCS decides to transfer a child to a higher-priority placement, the challenger need not show abuse of discretion.

OCS argues that AS 47.10.080(s)'s clear and convincing evidence standard is not dispositive in all challenges to placement transfer. OCS points out that AS 47.14.100(e) directs it to prioritize placement first with family members and then with family friends unless it has clear and convincing evidence of good cause to deviate from these placement priorities. When OCS follows the statutory placement preferences, we have held that the superior court should review OCS's placement decision for abuse of discretion.[28] Therefore, OCS argues, when it transfers a child to a higher priority placement, a party challenging the transfer must show *both* clear and convincing evidence that the transfer is contrary to the child's best interests *and* an abuse of discretion. Allowing the court to deny a transfer based solely on the child's best interests would, according to OCS, frustrate OCS's ability to carry out the legislative policy of placing children with family and friends.

This argument requires us to construe AS 47.10.080(s) and AS 47.14.100(e) together and harmonize their requirements to the extent possible. "The goal of statutory construction is to give effect to the legislature's intent, with due regard

---

[27]    OCS argues that even if the court did not apply the clear and convincing evidence standard we can still affirm its order because its unchallenged factual findings do not establish, as a matter of law, clear and convincing evidence that the transfer was contrary to Gene's best interests. Because the court made no finding about and did not even appear to consider the effect on Gene of changing caregivers, we cannot affirm the court's ruling under the correct standard.

[28]    *In re B.L.J.*, 717 P.2d 376, 380-81 (Alaska 1986).

for the meaning the statutory language conveys to others."[29]  "Interpretation of a statute begins with its text."[30]  We give unambiguous statutory language its "ordinary and common meaning."[31]  We will also "look to legislative history as a guide to construing a statute's words."[32]  "Under our sliding scale approach to statutory interpretation, 'the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be' to guide our understanding of the statute."[33]  We interpret statutes "in context with other pertinent provisions rather than in isolation, and with a view toward reconciling conflict and producing a harmonious whole."[34]

In *In re B.L.J.* we recognized that OCS has both the statutory authority and the expertise to make placement decisions for children in its custody.[35]  Because the legislature committed placement decisions to OCS's discretion, we concluded that the proper standard of judicial review for OCS's placement decisions was the abuse of discretion standard.[36]

The legislature then enacted what would become AS 47.10.080(s), providing that "a party opposed to the proposed transfer may request a hearing and must

---

[29]     *Ray v. State*, 513 P.3d 1026, 1033 (Alaska 2022) (quoting *City of Valdez v. State*, 372 P.3d 240, 254 (Alaska 2016)).

[30]     *Pruitt v. Off. of Lieutenant Governor*, 498 P.3d 591, 600 (Alaska 2021).

[31]     *Roberge v. ASRC Constr. Holding Co.*, 503 P.3d 102, 104 (Alaska 2022).

[32]     *Id.* (quoting *Cora G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 461 P.3d 1265, 1277 (Alaska 2020)).

[33]     *Id.* at 109 (quoting *Adamson v. Mun. of Anchorage*, 333 P.3d 5, 11 (Alaska 2014)).

[34]     *Good v. Mun. of Anchorage*, 450 P.3d 693, 698 (Alaska 2019) (citation omitted).

[35]     717 P.2d 376, 380 (Alaska 1986).

[36]     *Id.* at 380-81.

prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child for the court to deny the transfer."[37] The proposed legislation initially required that OCS obtain a court order to transfer a child in most instances.[38] At a hearing of the House Judiciary Committee, the State, through an assistant attorney general (AAG),[39] proposed an amendment with broader language: "Any party opposed to the proposed transfer may request a hearing and *must prove an abuse of discretion by the department* for the court to deny the transfer."[40] The AAG explained that this amendment "generally represents the current state of the law": "the department has discretion to place," and when a party objects there is "a hearing to see if the department abused its discretion."[41]

Legislators took issue with the abuse of discretion standard. Representative Ethan Berkowitz proposed replacing the abuse of discretion standard with a standard requiring "the party opposed [to] prove that it is not in the best interests of the child to approve the transfer," by either a preponderance of the evidence or clear and convincing evidence.[42] The AAG responded that the State's amendment, which

---

[37]     *See* ch. 99, § 30(s), SLA 1998.

[38]     Committee Substitute for House Bill 375 (HES), 20th Leg., 2d Sess., § 43 (1998).

[39]     Testimony of Susan Wibker, Assistant Att'y Gen. at 44:00-44:30, Hearing on H.B. 375, before the H. Judiciary Comm., 20th Leg., 2d Sess. (Apr. 23, 1998) [hearing on H.B. 375] (Wibker Testimony).

[40]     Minutes, House Judiciary Comm. Hearing on H.B. 375, 20th Leg., 2d Sess., at 2096 (Apr. 23, 1998) (emphasis added).

[41]     Wibker Testimony at 44:28-44:45.

[42]     Statement of Rep. Ethan Berkowitz, Hearing on H.B. 375, supra note 39, at 46:10-46:22, (Berkowitz Statement).

reflected existing law, already required any move to be in the child's best interests.[43] Representative Berkowitz countered:

> But that's the interest as determined by the department's discretion, not the interest as validated by the objective court. And . . . that's an important distinction. For an outside party to challenge the department based on they've abused their discretion, that's nearly impossible to prove. But for them to assert that it's not in the best interests of the child — which is what the litigation should be about — is a threshold we can reach either with clear and convincing, or beyond a reasonable doubt, with preponderance. And that's where the focus ought to be.[44]

Several other participants at the hearing were skeptical of applying an abuse of discretion standard to placement transfer decisions and expressed a preference for a less deferential standard. For example, Chairman Joe Green observed that the abuse of discretion standard "seem[ed] a little one-sided" and preferred an "approach that would not [set such] an extremely high standard" because he did not know how a court could possibly deem a transfer an abuse of discretion.[45] Representative Brian Porter stated that "instead of [having to] prove that there was an abuse of discretion by the department," a party challenging a transfer should have to "prov[e] the move was not in the best interests of the child."[46] And the deputy commissioner of the Department of Health and Social Services agreed, saying that the standard "ought to be the child's best interests. . . . [T]hat's a much better construction, it seems, from a practical

---

[43]    Wibker Testimony at 47:55-48:10.

[44]    Berkowitz Statement at 48:10-48:57.

[45]    Statement of Rep. Joe Green, Hearing on H.B. 375, supra note 39, at 50:52-51:12, 1:02:35-1:02:49 (Green Statement).

[46]    Statement of Rep. Brian Porter, Hearing on H.B. 375, supra note 39, at 59:09-59:16 (Porter Statement).

standpoint. It focuses on the purpose, which is to focus on the interests of the child."[47] The hearing concluded with the committee adopting the standard now contained in AS 47.10.080(s): the court can deny a transfer if there is clear and convincing evidence that it would be contrary to the child's best interests.[48]

OCS maintains that both this standard and the abuse of discretion standard should apply when a party challenges transfer to a higher priority placement. In effect OCS's argument would render the clear and convincing evidence standard — adopted precisely because it is more objective and less deferential to OCS — ineffective in those cases. Abuse of discretion review, as described in *In re B.L.J.*, examines OCS's placement decision "to determine if it is in the best interests of the minor."[49] Clear and convincing evidence review under AS 47.10.080(s) also focuses on the best interests of the minor. The difference between the standards of review is the level of deference to OCS's decision. Requiring a party challenging a placement transfer to make both showings makes the less-deferential standard superfluous.

The text of AS 47.10.080(s) does not suggest that the legislature intended its standard to control only a subset of placement transfers. The statute is broadly written; it applies to a "transfer [of] a child, in the child's best interests, from one placement setting to another."[50] This text does not differentiate between particular kinds of placement settings, nor does the judicial review provision otherwise limit the kinds of transfers to which the clear and convincing evidence standard applies. Based

---

[47] Testimony of Russell Webb, Deputy Comm'r, Dep't of Health & Soc. Servs., Hearing on H.B. 375, supra note 39, at 57:15-57:50 (Webb Testimony).

[48] Minutes, House Judiciary Comm. Hearing on H.B. 375, 20th Leg., 2d Sess., at 0807 (April 23, 1998).

[49] *In re B.L.J.*, 717 P.2d 376, 380-81 (Alaska 1986).

[50] *See* AS 47.10.080(s).

on the statutory text, it would seem that the legislature intended this standard to govern all placement transfers.

The text of AS 47.14.100(e) and (m) does not require a judge to review a proposed placement transfer for abuse of discretion, even if the transfer is to a higher priority placement. Rather, our ruling in *In re B.L.J.* adopted that standard of review for placement decisions generally. The legislature then changed the standard of review for the subset of placement decisions that entail placement transfers by adopting AS 47.10.080(s). Nothing in the text of AS 47.14.100 supplants or negates AS 47.10.080(s).

Where AS 47.14.100 prescribes a standard of judicial review, it reinforces, rather than supplants, AS 47.10.080(s)'s clear and convincing evidence standard. OCS must show "clear and convincing evidence of good cause" to deviate from the statutory placement preferences.[51] This standard reflects legislative policy to allow exceptions to the general preference for placement with family and friends. For example, some children suffer from attachment disorders. The need to protect a child's hard-won attachment to a long-term foster parent may be good cause not to place the child with a family member who has recently sought placement.[52] The standard under

---

[51] AS 47.14.100(e).

[52] Additional placement rules govern cases arising under the Indian Child Welfare Act (ICWA). *See* 25 U.S.C. § 1915(b) (establishing placement preferences for Indian child in foster care); *see also* 25 C.F.R. § 23.131 (2023) (same). An Indian child must be placed according to statutory placement preferences unless good cause exists to deviate. 25 C.F.R. § 23.129. What may be considered good cause is limited. 25 C.F.R. § 23.132. For example, a determination of good cause may not be based "solely on ordinary bonding or attachment that flowed from time spent in a non-preferred placement that was made in violation of ICWA." 25 C.F.R. § 23.132(e). Nor may a placement "depart from the preferences based on the socioeconomic status of any placement relative to another placement." 25 C.F.R. § 23.132(d).

AS 47.14.100(e) for justifying an exception to the placement preferences is easily reconciled with AS 47.10.080(s) when a placement transfer is involved. If the party challenging transfer to a higher-priority placement shows clear and convincing evidence that the transfer would be contrary to the child's best interests, that is clear and convincing evidence of good cause to deviate from the statutory placement priorities.

The legislative policy behind AS 47.10.080(s) was to "limit the number of placements that children have to go through"[53] by providing for judicial review of proposed transfers that is objective rather than deferential to OCS's position. Requiring abuse of discretion review for a proposed transfer to a higher-priority placement would completely subordinate AS 47.10.080(s)'s policy to AS 47.14.100(e)'s policy of placement with family and friends. By contrast, requiring only clear and convincing evidence review in these cases gives effect to *both* legislative policies. A challenger who shows clear and convincing evidence that transfer is contrary to the child's interests has also met the elevated burden of proof to justify placing the child with a lower-priority placement. The clear and convincing evidence standard accomplishes the goal of objective judicial review and the goal of giving weight to the benefit of placement with friends and family. It better reconciles the statutory policies than abuse of discretion review.

OCS argues that the legislative history shows the legislature intended the clear and convincing evidence standard of AS 47.10.080(s) to apply only when a child is transferred from one nonrelative foster family to another. It points to legislators' statements suggesting the standard would apply only to transfers to a "department-approved setting" — i.e. not a family member or friend. But that does not seem to be what the legislators meant. These statements were made when the AAG voiced concern

---

[53] *See, e.g.*, Webb Testimony at 56:19-58:02.

that the committee's proposal would allow a party objecting to a transfer to argue that the child should be transferred elsewhere.[54] Representative Dyson rejected the AAG's interpretation. He explained that the committee's proposal would allow a party only to argue against the transfer that OCS had proposed — necessarily a "department-approved situation" — not to propose an entirely new placement.[55] Other representatives agreed with Representative Dyson.[56] Representative Berkowitz clarified that "[i]t's not as if the other interested party can come in and say, 'Wait a second, I don't want it to go between department-approved, I want it to come to me' or 'I want it to go to my aunt,' " because the proposed standard would apply only when the "department already has established that the child is in . . . a department-approved setting, and now the department is getting ready to move it to another setting."[57] In this discussion there is no indication that the legislature intended to limit AS 47.10.080(s)'s application to transfers between nonrelative foster homes.

Having considered statutory text, legislative history, and purpose, we conclude that a party challenging a proposed transfer to a higher priority placement

---

[54] Wibker Testimony at 51:12-51:35; Statement of Rep. Fred Dyson, Hearing on H.B. 375, supra note 39, at 51:36-51:46, (Dyson Statement).

[55] Dyson Statement at 51:36-51:46.

[56] *See* Statement of Rep. Jeannette James, Hearing on H.B. 375, supra note 39, at 51:46-52:05 ("[If] the department has made a decision to change [the placement], then . . . the argument is whether they should have changed or not. . . . That is not the situation that [Wibker described]."); Berkowitz Statement at 52:53-53:09 ("[T]his section just says the department may transfer a child from one placement setting to another. So the department has already established that the child is in a placement setting. So [the child is] in a department-approved setting, and now the department is getting ready to move it to another setting.").

[57] Berkowitz Statement at 52:53-53:20.

must show only clear and convincing evidence that the proposed transfer is contrary to the child's best interests. The challenger need not also show an abuse of discretion.

### 3. When OCS proposes to transfer a child due to disapproval of the existing placement, the challenger need not show abuse of discretion.

OCS makes a similar argument with regard to placement transfers based on foster care licensing issues. Citing its statutory authority to license foster care homes,[58] OCS argues that AS 47.10.080(s) was not intended to permit a court to force continued placement in a home that OCS is no longer willing to license. Therefore, OCS argues, a party challenging a transfer based on OCS's decision to deny or revoke the current placement's foster care license must show that OCS abused its discretion in addition to showing clear and convincing evidence that transfer is contrary to the child's best interests. This argument, like OCS's argument concerning preferred placements, supplants AS 47.10.080(s)'s clear and convincing evidence standard with an abuse of discretion standard.

Revisiting the statutory text, AS 47.10.080(s) is not limited to particular categories of placement transfer. The statute applies to all transfers, for all reasons. OCS argues that references in legislative history to "department-approved" placements suggest the legislators intended the clear and convincing evidence standard apply only if the department continued to approve the existing placement. But this interpretation is not convincing because those comments were made in response to the suggestion that the legislation would allow challengers to suggest some third, yet-to-be-designated placement.[59] Legislators did not discuss a scenario in which OCS no longer approved

---

[58]  AS 47.32.020(b).

[59]  *See, e.g.*, Wibker Testimony at 51:12-51:35 (explaining State's concerns that this statute would permit parties to move for child to be moved to home that was

the existing placement.[60]  Therefore this snippet of legislative history is not enough to convince us that AS 47.10.080(s) was intended to govern a narrower range of cases than its text suggests.

That said, we doubt the legislature intended AS 47.10.080(s) to authorize a court to force OCS to keep a child in a placement that is prohibited by state or federal law.  For example, if a potential foster parent has been convicted of a felony involving violence against a child, both federal and state law prohibit OCS granting a variance so that the person may obtain a foster care license.[61]  A court may not force OCS to keep a child with that placement — potentially jeopardizing OCS's federal foster care funding[62] — even if firmly convinced that moving the child would be contrary to the child's best interests.

Yet in many instances the conduct or conditions that prompt OCS's concerns about continued placement with a foster family do not automatically disqualify continued placement.  Although such conduct is grounds for denying or revoking a foster care license, OCS has authority to allow continued placement by

not department-approved); Dyson Statement at 51:35-51:53 (explaining that in a transfer situation child would "already be in a department-approved situation").

[60]     *See generally* Minutes, House Judiciary Comm. Hearing on H.B. 375, 20th Leg., 2d Sess., at 2096 (Apr. 23, 1998).

[61]     *See* 42 U.S.C. § 671(a)(20)(A)(i) (prohibiting placement approval for prospective foster parents convicted of felony involving spousal abuse, child abuse or neglect, other crimes of violence, other crimes against children); 7 AAC 10.930(g) (stating the department will not grant variance for crimes for which federal law prohibits approval).

[62]     *See* 42 U.S.C. § 671(a)(20)(A)(i) (making state ineligible for federal funding if state permits prospective foster or adoptive parent convicted of enumerated felony).

granting a variance.[63]  This brings us back to the question at hand.  If OCS decides to transfer a child due to this kind of excusable deficiency by the foster family, must a party challenging the transfer show that OCS's decision is both an abuse of discretion and clearly contrary to the child's best interests?

OCS does not point to any statutory text that mandates abuse of discretion review in this scenario.  There is no direct judicial review of OCS's foster care licensing decisions.[64]  Licensing decisions are reviewable only indirectly, when a court reviews a placement denial under AS 47.14.100(m) or a placement transfer under AS 47.10.080(s).  As noted above, we adopted the abuse of discretion standard to review those decisions in *In re B.L.J.*, and the legislature then adopted a different standard for transfers in AS 47.10.080(s).  The statutes OCS cites for its authority to make licensing decisions do not contain standards for judicial review that supplement or supplant AS 47.10.080(s)'s standard for judicial review of proposed transfers.[65]

OCS argues that abuse of discretion review is needed to prevent courts forcing continued placement of a child with a foster family that OCS disapproves of. The argument is unpersuasive because abuse of discretion review does not preclude that

---

[63]     *See* AS 47.32.030(a)(3)(D) (conferring authority on OCS's parent agency to pass regulations providing for variances and exceptions to licensing requirements); 7 AAC 10.9505 (providing for general variances for foster care licensing requirements); 7 AAC 10.930 (providing for variances for barrier crimes).  According to OCS policy the agency will grant a variance only if there is an alternative to the condition or requirement in question that "adequately protects the health and safety of children in care." *See* ALASKA OFF. OF CHILD.'S SERVS., COMMUNITY CARE LICENSING MANUAL § 225 (2016).

[64]     *See* AS 47.32.070 (providing for administrative review of OCS's licensing decisions with Department of Family and Community Services, but not providing for judicial review of these decisions).

[65]     *See* AS 47.32.020(a) (not providing a standard of review); AS 47.32.010(b)(3) (same).

possibility. Any standard of judicial review entails the possibility of OCS being forced to place a child with a person of whom it does not approve.[66] The contrary to best interests review may be less deferential to OCS, but that does not make it inherently incompatible with OCS's authority over foster-care licensing.

The difference between the standards, though significant, is unlikely to result in many proposed placement transfers being denied. Foster care licensing is not a mere technical requirement. It is "closely tied to OCS's statutory responsibilities as well as the safety and security of the children in its care."[67] Evidence that the existing placement cannot meet licensing requirements will often reflect on the placement's ability to provide a safe and healthy home for the foster child. Licensing failures by the current placement will therefore be highly relevant to determining whether the transfer is clearly contrary to the child's best interests. Yet the clear purpose behind AS 47.10.080(s) was to balance the suitability of the existing placement against the potential harm from disrupting the child's attachments and stability — and to have a court objectively review that balance rather than deferentially review OCS's own determination. We decline to undermine these legislative purposes by supplanting the clear and convincing evidence standard of review expressly adopted by the legislature with a judicially derived abuse of discretion standard. A party challenging a placement transfer need not show that OCS abused its discretion.

### 4. We overrule the portion of *Zander B.* that applied an abuse of discretion standard to placement transfers.

OCS relies on our decision in *Zander B.*, which applied an abuse of discretion standard to a transfer challenge. In that case the child's foster parents sought

---

[66] *See* AS 47.14.100(m) (authorizing certain people to seek judicial review of placement denial and therefore contemplating courts could overturn OCS's placement decisions, even if based on considerations related to licensing).

[67] *In re Adoption of Missy M.*, 133 P.3d 645, 652 (Alaska 2006).

to challenge OCS's decision to remove the child from their care and transfer him to his maternal grandmother.[68]  The CINA statutes do not expressly authorize foster parents to challenge placement denials or placement transfers.  The foster parents sought to intervene so they could invoke AS 47.10.080(s) to challenge OCS's decision.  After holding that the superior court did not err or abuse its discretion in allowing the foster parents to intervene, we affirmed the superior court's determination that the proposed transfer was an abuse of discretion.[69]  The opinion did not explain why abuse of discretion review was proper or cite authority holding that abuse of discretion review applies to placement transfers.[70]

For the reasons described above, applying abuse of discretion review to a placement transfer challenge was wrong.  We therefore must decide whether to overrule this aspect of *Zander B.*  We will overrule a prior decision only when clearly convinced that (1) "the rule was originally erroneous or is no longer sound because of changed conditions" and (2) "more good than harm would result from a departure from precedent."[71]

A decision is originally erroneous if the rule announced proves to be "unworkable in practice" or if the other party "would *clearly* have prevailed" if the issue

---

**68**      *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Zander B.*, 474 P.3d 1153, 1157 (Alaska 2020).

**69**      *Id.* at 1171-72.

**70**      *Id.* at 1173-74. The opinion addressed the standard of review only to disavow previous assertions that the superior court's finding of an abuse of discretion is reviewed for clear error, as was stated in *A.H. v. State*, 779 P.2d 1229, 1234 (Alaska 1989).  The opinion clarified that abuse of discretion review is a mixed question of fact and law.  *Zander B*, 474 P.3d at 1173-74.

**71**      *Buntin v. Schlumberger Tech. Corp.*, 487 P.3d 595, 603 (Alaska 2021) (quoting *Wassillie v. State*, 411 P.3d 595, 611 (Alaska 2018)).

in question had been "fully considered."[72]  In *Zander B.* the parties' briefing on the applicable standards of review was not entirely clear.  OCS's brief mentioned both abuse of discretion and clear and convincing evidence review but did not explain the relationship between the two standards.  The foster family's brief appeared to accept the abuse of discretion standard.  Our decision expressly applied abuse of discretion review without discussing AS 47.10.080(s).[73]  Had the foster parents made the arguments that Blythe made in this case, they clearly would have prevailed on this issue.  Therefore *Zander B.* was originally erroneous on this point.

Deciding whether more good than harm would result from overruling our precedent requires balancing "the benefits of adopting a new rule against the benefits of stare decisis."[74]  The scale tips clearly in favor of correcting our mistake.  First, doing so respects the separation of powers by giving effect to legislative intent.  Second, *Zander B.* is only two years old and has been relied on very little.[75]  It seems unlikely that OCS or particular individuals have made decisions or structured their affairs in reliance on the particular standard used to review placement transfers.  Correcting this error will cause little disruption.  Therefore we overrule *Zander B.* to the extent inconsistent with this opinion.

---

[72]  *Id.* (emphasis in original).

[73]  *Zander B.*, 474 P.3d at 1173-74.

[74]  *Buntin,* 487 P.3d at 605 (quoting *State v. Carlin*, 249 P.3d 752, 761-62 (Alaska 2011)).

[75]  *See Laura M.-J. v. State, Dep't of Health & Soc. Servs., Off. of Children's Servs.*, No. S-18094, 2022 WL 2825676, at *5 (Alaska July 20, 2022); *see also Celia W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-17954, 2021 WL 4191436, at *3 (Alaska Sept. 15, 2021) (distinguishing *Zander B.* as "not exactly on point").  No other cases from our court have relied on *Zander B.* when applying an abuse of discretion standard to a transfer challenge.

**C.    The Error In Applying The Placement Preference Statute Was Harmless.**

"Alaska law has long demonstrated a preference that children who are in OCS's custody be placed with family members."[76]  When a child is taken into OCS's custody, OCS must place the child, "in the absence of clear and convincing evidence of good cause to the contrary, . . . with, in the following order of preference, (A) an adult family member; (B) a family friend who meets the foster care licensing requirements established by the department; (C) a licensed foster home . . . ; [or] (D) an institution for children."[77]  The superior court determined that Kathryn was an adult family member and that Vivian and Robert were family friends.  The superior court then ruled that Kathryn had priority over Robert and Vivian by law and that there had been no showing of good cause to deviate from the statutory placement preferences.

Blythe argues that the superior court erred by classifying Kathryn as an adult family member because Kathryn does not meet the statutory definition.[78]  Describing Kathryn as Gene's step-cousin, Blythe argues that Kathryn was merely a family friend and therefore was not preferred over Robert and Vivian, who were also family friends.

Kathryn is not Gene's adult family member for purposes of statutory placement preference.  The CINA statutes define an "adult family member" in cases not involving an Indian child as "a person who is 18 years of age or older and who is (A) related to the child as the child's grandparent, aunt, uncle or sibling; [or] (B) the

---

[76]    *Irma E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 312 P.3d 850, 853 (Alaska 2013).

[77]    AS 47.14.100(e).

[78]    *See Diego K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 411 P.3d 622, 627 (Alaska 2018) (reviewing de novo whether superior court's findings satisfy requirements of CINA statutes).

child's sibling's legal guardian or parent."[79]  Kathryn is a cousin by marriage and does not meet the definition of adult family member.

Kathryn nevertheless qualifies for some placement preference as a family friend.  She testified that she had known Danny his entire life, that Danny and Blythe had introduced Gene to her when he was an infant, and that she had "intermittently" seen him at family functions.  Although her relationship to Gene did not grant her adult family member status, it did render her exempt from foster care licensing requirements as his relative.[80]  Kathryn was therefore "a family friend who meets the foster care licensing requirements established by the department."[81]

Robert and Vivian, on the other hand, are no longer entitled to placement preference as family friends because they failed to comply with the requirements of their emergency foster care license.[82]  OCS granted them a license on the condition that Timothy, who had committed multiple barrier crimes, would not live on their property.  The superior court found that Robert and Vivian violated this condition.

The superior court's classification errors are harmless because they offset each other.  Kathryn, a family friend who meets foster care licensing requirements by virtue of being exempt from them, is preferred to Robert and Vivian, family friends who do not meet foster care licensing requirements.  The superior court's ultimate

---

[79]    AS 47.10.990(1).

[80]    *See* 7 AAC 50.010(a)(6) (exempting individuals operating foster homes "only for one or more relatives"); 7 AAC 50.990(42) (defining "relative" as "an individual who is related to another by blood, adoption, marriage, or tribal custom"). 7 AAC 50.010(a)(6) was repealed in July 2022 but was in force at the time the decision was made to render Kathryn exempt.

[81]    *See* AS 47.14.100(e)(3)(B).

[82]    The plain language of AS 47.14.100(e) limits priority placement for "family friend[s]" only to those "who meet[] the foster care licensing requirements established by the department."

conclusion was correct: OCS did not have to show clear and convincing evidence of good cause to justify placing Gene with Kathryn instead of Robert and Vivian.

**D. The Superior Court Did Not Fail To Apply The Statutory Presumption That Maintaining A Child's Relationship With Siblings Is In the Child's Best Interests.**

The legislature has directed courts to "recognize a presumption that maintenance of a sibling relationship . . . is in a child's best interest[s]."[83] This presumption focuses on the sibling *relationships*; it is not a presumption that siblings be placed in the same household.[84] Blythe argues that the superior court's order failed to acknowledge Gene's strong relationship with his siblings or the statutory presumption that maintaining a child's relationship with siblings is in the child's best interests.

The superior court adequately considered the relationship and applied the presumption. The court found credible testimony that Gene was "very close with his half-siblings," that his bond with them "was probably stronger" than his bond with Kathryn, and that Kathryn was aware that Gene "misses his half-siblings." The court also found that although "there was some trouble setting up visits" because Kathryn and Vivian had a "text altercation," Kathryn "is very supportive of the sibling relationships" and facilitates weekly in-person visits and additional phone visits with them. When the court analyzed Gene's placement with Kathryn, the court further noted that Gene was "having quality time" with his half-siblings. Placement with Kathryn therefore supports the maintenance of Gene's sibling relationships, and we see no error in the superior court's treatment of this issue.

---

[83] AS 47.10.080(w).

[84] A separate statute requires OCS to "make reasonable efforts to place siblings in the same placement if the siblings are residing in the same home when taken into the custody of the department." AS 47.14.100(r). This statute does not apply to Gene, who lived in a different household than his half-siblings at the time he was removed from his parents' care.

## V. CONCLUSION

We REVERSE the superior court's decision.